# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| The Estate of GUGSA ABRAHAM DABELA, Deceased; and ABRAHAM DABELA in his capacity as the Personal Representative of the Estate of Gugsa Dabela; )<br><br>Plaintiffs, )<br><br>vs. )<br><br>The TOWN OF REDDING, a municipal corporation; DOUGLAS FUCHS, individually and in his official capacity as Chief of Police; RYAN ALCOTT, individually and in his official capacity as a public safety officer; MARC DELUCA, individually and in his official capacity as a public safety officer; PETER QUINN, individually and in his official capacity as a public safety officer; TIMOTHY SUCCI, individually and in his official capacity as a public safety officer; BRANDON KAUFMAN; individually and in his official individually and in his official capacity as a public safety officer; BRITTANY SALAFIA, individually and in her official capacity as a public safety officer; MICHAEL LIVINGSTON, individually and in his official capacity as a public safety officer; and KILLER JOHN DOE; )<br><br>Defendants. ) | COMPLAINT<br>Civil Number: |

## **COMPLAINT**

Plaintiffs, by and through their attorneys, EXCOLO LAW, PLLC, for their complaint

against Defendants the City of Redding, Douglas Fuchs, Ryan Alcott, Marc DeLuca, Peter

1

Quinn, Timothy Succi, Brandon Kaufman, Brittany Salafia, Michael Livingston and Killer John Doe, state as follows:

## **PARTIES**

1. Plaintiff the Estate of Gugsa Abraham Dabela is the estate of Gugsa Abraham Dabela ("Mr. Dabela"), a deceased person who was a resident of the town of Redding, Fairfield County, Connecticut.

2. Plaintiff Abraham Dabela ("Dr. Dabela") is the father of the decedent, Gugsa Dabela, and is the personal representative and an administrator of the Estate of Gugsa Abraham Dabela. Dr. Dabela is a resident of the Town of Bethesda, Montgomery County, Maryland.

3. Defendant the Town of Redding, is a municipal corporation located in the County of Fairfield, and organized under the laws of the State of Connecticut.

4. Defendant Douglas Fuchs ("Fuchs"), is the chief of police at the Redding Police Department and is and at all times relevant to this Complaint was employed by the Redding Police Department in the Town of Redding, and upon information and belief, is a resident of the State of Connecticut, County of Fairfield.

5. Defendant Ryan Alcott ("Alcott"), is a public safety officer at the Redding Police Department and is and at all times relevant to this Complaint was employed by the Redding Police Department, and upon information and belief, is a resident of the State of Connecticut, County of Fairfield.

6. Defendant Marc DeLuca ("DeLuca"), is a public safety officer at the Redding Police Department and is and at all times relevant to this Complaint was employed by the

Redding Police Department in the Town of Redding, and upon information and belief, is a resident of the State of Connecticut, County of Fairfield.

7. Defendant Peter Quinn ("Quinn"), is a public safety officer at the Redding Police Department and is and at all times relevant to this Complaint was employed by the Redding Police Department in the Town of Redding, and upon information and belief, is a resident of the State of Connecticut, County of Fairfield.

8. Defendant Timothy Succi ("Succi"), is a public safety officer at the Redding Police Department and is and at all times relevant to this Complaint was employed by the Redding Police Department in the Town of Redding, and upon information and belief, is a resident of the State of Connecticut, County of Fairfield.

9. Defendant Brandon Kaufman ("Kaufman"), is a public safety officer at the Redding Police Department and is and at all times relevant to this Complaint was employed by the Redding Police Department in the Town of Redding, and upon information and belief, is a resident of the State of Connecticut, County of Fairfield.

10. Defendant Brittany Salafia ("Salafia"), is a public safety officer at the Redding Police Department and is and at all times relevant to this Complaint was employed by the Redding Police Department in the Town of Redding, and upon information and belief, is a resident of the State of Connecticut, County of Fairfield.

11. Defendant Michael Livingston ("Livingston"), is a public safety officer at the Redding Police Department and is and at all times relevant to this Complaint was employed by the Redding Police Department in the Town of Redding, and upon information and belief, is a resident of the State of Connecticut, County of Fairfield.

12. Defendant Killer John Doe is of unknown employment and residency.

## JURISDICTION AND VENUE

13. Jurisdiction is founded on 28 U.S.C. § 1331 in that this action arises under the Constitution and laws of the United States.

14. This action presents various Constitutional, statutory, and common law claims arising under 42 U.S. Code §1983, 42 U.S. Code §1985 and the state law of Connecticut.

15. Pursuant to 42 U.S.C. Section 1983, 42 U.S. Code §1985 and other applicable law, this Court is justified to award nominal, compensatory, and punitive damages, and equitable relief against all individual Defendants, in their individual capacity, and against Defendant the Town of Redding for the past and ongoing violations of Plaintiffs' Constitutional rights and the harm caused by their actions.

16. Venue lies in this district pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

17. Mr. Dabela was a gregarious thirty-five year old African American man who was also a licensed private practice attorney and an outspoken advocate for the Second Amendment of the United States Constitution; the right of the people to keep and bear Arms. In August, 2011, following his graduation from law school he accepted a position with the law firm of Wilson Elser LLP in Stamford, Connecticut and he moved from New York City to Redding, Connecticut; a wealthy and predominantly white suburban town. During the months of January through April of 2013, Mr. Dabela was met with unlawful delay by the Redding police department in his efforts to obtain a concealed pistol permit which he was legally permitted to obtain and finally did obtain on April 9, 2013. On April 5, 2014 at approximately 1:39 a.m., the Redding Police Department alleges that Mr. Dabela was found unresponsive in his vehicle which was overturned off the side of a road, less

than a mile away from his home, with a bullet wound through the back of his head; he was murdered. Within five hours of discovering Mr. Dabela's body and overturned vehicle, the Redding Police Department informed Mr. Dabela's landlord's that his death was a suicide and issued a press release to describing the gunshot as "self-inflicted" prior to making any successful attempts to contact Mr. Dabela's family to notify them of his untimely passing and without conducting virtually *any* investigation as to whether there could have been any other individuals involved, or foul play. None of the facts or evidence support the conclusion that Mr. Dabela committed suicide. The Defendants in this case conspired to cover up Mr. Dabela's murder and still to this day have not made any efforts whatsoever to locate and prosecute Mr. Dabela's murderer. This Complaint is based on the following facts:

18. On January 24, 2013, Mr. Dabela appeared in person at the Town of Redding's Police Department, before Defendant Alcott, the officer designated by the Chief of Police, Defendant Fuchs, to accept applications for permits to carry concealed pistols, and presented the required items of identification along with a legally sufficient application for a concealed pistol permit (CPP) as governed by Connecticut General Statute § 29-28.

19. Mr. Dabela was then interviewed and fingerprinted by Defendant Alcott, thereby completing the application.

20. Under Connecticut law, the Redding police department was required to notify Mr. Dabela within eight weeks of the date of the application as to whether his application was approved or denied.

21. In processing the application, Defendants Fuchs and Alcott insisted on requesting unnecessary information from Mr. Dabela. Defendant Fuchs also informed Mr. Dabela

that the processing would take a longer time than usual because, according to Defendant Fuchs, the individuals Mr. Dabela provided as character references would need to be interviewed individually by Defendant Alcott.

22. Two months after filing the application Mr. Dabela heard nothing back from the Redding Police Department regarding whether he was approved or denied the concealed pistol permit.

23. On March 26, 2013, Mr. Dabela contacted Defendant Fuchs inquiring about the unlawful delay in the processing of his CPP application and Defendant Fuchs responded by questioning Mr. Dabela's sense of "extreme urgency" to obtain a CPP.

24. Surprised and frustrated by Defendant Fuchs' response and mischaracterization of Mr. Dabela's request that the Redding police department adhere to and obey Connecticut legislature, on April 3, 2013, nine and a half weeks after the date his CPP application was submitted to the Redding police department, Mr. Dabela wrote an e-mail to Reuben Bradford, the Commissioner of the Connecticut Department of Emergency Services and Public Protection, expressing his disappointment with Defendant Fuchs and his department's mishandling of Mr. Dabela's CPP application.

25. Upon knowledge and belief, on April 5, 2013, Commissioner Bradford admonished Defendant Fuchs, informing him that there was no basis for not granting Mr. Dabela's application.

26. Finally, on April 9, 2013, Mr. Dabela was issued his concealed pistol permit.

27. Upon information and belief, there was no backlog of applications for CPP's with the Redding police department during the months of January through April of 2013. Furthermore, Mr. Dabela had personal knowledge of at least one other individual who

applied for a CPP with the Redding police department *after* Mr. Dabela submitted his application, and was granted a CPP *prior* to Mr. Dabela being granted his CPP.

28. In the following twelve months after obtaining his CPP, Mr. Dabela became increasingly involved in local town politics in the Town of Redding, and he sought to assist individuals throughout the State of Connecticut with legal issues related to gun permitting and the Second Amendment. Mr. Dabela had notable victories in Milford, Connecticut four months prior to his murder, and Stamford, Connecticut two weeks prior to his murder.

29. Throughout 2014, Mr. Dabela also began attending local Town Hall meetings, including some at which he interacted with Defendant Fuchs. Mr. Dabela would often discuss with local residents at an establishment called The Little Pub and other local meeting spots, the property tax grievance process, in hopes of developing new clients.

30. Two nights prior to his death it has been reported by a number of witnesses that Mr. Dabela had a heated argument with a town "finance official" about property taxes. To date, the Defendants have failed to identify to Plaintiffs who this individual was, and whether he was questioned by any of the Defendants in relation to the argument.

31. Nearly one year to the day after Mr. Dabela obtained his concealed carry permit, on April 5, 2014, during the very early morning hours, Mr. Dabela was murdered by Defendant Killer John Doe, by a single gunshot through the back of his head, with the bullet entrance wound approximately one inch behind the right ear and the exit wound approximately one inch behind his left ear.

32. After successfully negotiating several similar turns in the three minutes he had been driving toward his home, the vehicle Mr. Dabela was driving suddenly veered off the

road and became overturned, coming to a rest on the vehicle's roof. Whether Mr. Dabela was murdered prior to the crash or afterwards is unknown at the present time.

33. Mr. Dabela received a text message at 12:03 am on the night of his murder which read: "turn he just didn't". Upon knowledge and belief, the sender of this text message's cell phone information was deleted at some point *after* Mr. Dabela's death. The cell phone was at all times after Mr. Dabela's death, and remains to this day, in the possession and control of the Defendants and persons acting at their direction on their behalf.

34. According to Redding Police Department records, a 911 caller anonymously reported a rollover car crash at approximately 1:36 am, without stopping at the scene, and the Redding Police Department was called to the scene.

35. Defendant Kaufman was the lone, first responding officer to arrive on scene, according to his own recollection, at 1:39 am.

36. Defendant DeLuca arrived on scene shortly after, between 1:40 to 1:43 am, according to his recollection, and upon arrival, observed Defendant Kaufman struggling with the driver's side door of the overturned vehicle.

37. This was not the first time Defendants Kaufman and DeLuca encountered Mr. Dabela. In fact, Defendants Kaufman and DeLuca had responded to an incident at Mr. Dabela's residence just two months prior to his death when his residence's security alarm was activated. When the officers arrived at the home, Mr. Dabela was in the yard inspecting the source of the alarm, and promptly identified himself to the officers and informed them that he was a resident on the property and that he was legally armed.

38. Mr. Dabela was allegedly found to be unresponsive and bleeding from the head inside the overturned vehicle which was damaged at the front end, driver's side, passenger's side, windshield and roof, and the driver's side window was completely shattered.

39. Mr. Dabela was allegedly found without having a seatbelt on, but his seatbelt was extended indicating that he was wearing the seatbelt at the time of the impact and had maneuvered his body from the overturned driver's seat to a position crawling across the roof. At the time he was shot, Mr. Dabela's head was positioned near the shattered driver's side window.

40. Mr. Dabela was removed from the vehicle by Defendants Kaufman and DeLuca prior to any photographs being taken of him in situs.

41. Mr. Dabela was pronounced dead by a paramedic on the scene of the crash at 2:11 am and his body was collected over two hours later and transported directly to the medical examiner's office.

42. The Defendants initial findings reported that Mr. Dabela was found with obvious injuries to his head and a swollen right eye, a bullet hole in the back of the driver seat, shoeprints on the front passenger window, hair on the front passenger window, blood on the roof of the car near the windshield and also on the steering wheel. The Defendants also reported that shortly upon removing Mr. Dabela's body from the vehicle, a firearm was found in the vehicle as well along with one spent shell casing of a .40 caliber bullet. However, no bullet was recovered from the scene by any Defendant, despite an obvious exit wound to Mr. Dabela's head.

43. At approximately 2:45 am, Defendants Quinn and Succi arrived on scene and began their investigation into the crash and also began to attempt to reconstruct the crash based on tire tracks and the position of the vehicle at its resting place.

44. Defendant Succi ultimately concluded that Mr. Dabela must not have slowed his speed for the upcoming curve and slid off the road, hitting an embankment which caused the vehicle to roll over onto its roof. Though Defendant Succi notes moderate damage to the driver's side and front of the vehicle, he concluded that the vehicle must have sustained the damage during the rollover and did not consider or explore the possibility that there may have been another vehicle involved that could have hit Mr. Dabela's vehicle and/or ran him off the road.

45. At approximately 4:25 am, two members from the chief medical examiner's office arrived on scene and were directed by Defendant DeLuca to perform gunshot residue tests on both of Mr. Dabela's hands. Mr. Dabela's hands were bagged to preserve evidence and for later testing for gunshot residue.

46. The Defendants never requested that an investigator from the medical examiner's office be called in to review the scene, despite there being a death by gunshot.

47. No crime scene investigator from the Connecticut State Police was called in to review the scene, despite there being a death by gunshot.

48. While Mr. Dabela's body remained at the site of the crash, prior to any medical examiner review, Defendants DeLuca and Kaufman visited Mr. Dabela's residence to attempt to make a death notification. Upon learning from Mr. Dabela's landlord's that Mr. Dabela rented a guest house on their premises, the Defendants informed the landlord that Mr. Dabela had died and together with the landlords the Defendants entered Mr. Dabela's

apartment. While seeking contact information for Mr. Dabela's next-of-kin, the Defendants joked with the landlords that they should be "happy" that Mr. Dabela decided to commit suicide in his car because it would have been "messy" if he had shot himself in their house.

49. Within five hours of Mr. Dabela being found and having not visited the scene of the crash and murder himself, Defendant Fuchs had written a press release and left it by the fax machine in the Redding Police Department. Defendant Fuchs also left written instructions to fax the press release to the press at 7:00 am.

50. Contrary to any other available press release by the Redding Police Department announcing the initial findings relating to an untimely death, the press release issued for Mr. Dabela's death identified Mr. Dabela's full name and age and stated that the incident was a "fatal motor vehicle crash" and that Mr. Dabela "…was deceased from a single gunshot wound to the head." The press release further stated "At this time it does not appear that there is anyone else involved in this incident and that the gunshot wound was self inflicted."

51. Upon information and belief, normal police protocol involving a death suspected to be by suicide does not include releasing the name of the victim to the public, especially not prior to the family of the decedent being notified.

52. Based on information provided on various occasions by Defendants DeLuca, Succi and Quinn and by Captain Mark O'Donnell, Defendant Fuchs personally drafted the press release, and none of such persons knew the basis for his decision to issue the press release or to include the contents stated therein. Defendants DeLuca and Succi stated that Defendant Fuchs did not visit the crash site.

53. The press release was distributed to an unknown number of media outlets, including the Associated Press, *prior* to notifying the family of Mr. Dabela of his untimely death, prior to a forensic pathology investigation to determine the nature and manner of death, and **without even so much as performing a simple gunshot residue test of Mr. Dabela's hands** which, if this was indeed a suicide, would have positively resulted in detection of gunshot residue on at least one of his hands.

54. At approximately 7:30 am, after being informed by his son's landlord that Mr. Dabela had died in a car crash, Dr. Dabela immediately called the Redding Police Department regarding his son and was again informed by Defendant DeLuca that Mr. Dabela had been involved in a car accident and died and that Dr. Dabela should contact the chief medical examiner's office. Defendant DeLuca did not inform Dr. Dabela of the gunshot, despite this fact having already been disclosed to Mr. Dabela's landlord and to the media.

55. Similarly, despite Mr. Dabela's landlord having been informed by Defendants Quinn and DeLuca of the gunshot and the "suicide" earlier that morning, Mr. Dabela's landlord had only informed Dr. Dabela that Mr. Dabela died in a car accident. On information and belief, the Plaintiffs believe that the Defendants intentionally directed Mr. Dabela's landlord to withhold this information from the family, despite having publicly issued a press release stating Mr. Dabela had committed suicide.

56. At approximately 8:00 am, Defendant DeLuca again made contact with a member of the chief medical examiner's office and learned that the gunshot residue tests had not yet been performed. At that time he again ordered the testing of Mr. Dabela's hands for gunshot residue.

57. Ultimately, at no time did anyone from the Redding Police Department or the chief medical examiner's office ever perform a single gunshot residue test of Mr. Dabela's hands which would have either supported the Defendants' position that Mr. Dabela took his own life, or it would have ruled it out completely.

58. Only when Dr. Dabela finally got through to the medical examiner's office by telephone at approximately 9:30am was he informed by the medical examiner that Mr. Dabela died from a gunshot to the head and not from the accident. Suicide was not mentioned, and it wasn't until later in the day when Mr. Dabela's father heard from the news that the Defendants had already reported the manner of Mr. Dabela's death as a suicide, *prior* to an autopsy and also prior to conducting any interviews of witnesses who may have been with or seen Mr. Dabela on the night of his death.

59. The medical examiner informed Mr. Dabela's father at 9:30 a.m. that Mr. Dabela died from a gunshot to the head and not from the accident. Suicide was not mentioned, and it wasn't until later in the day when Mr. Dabela's father heard from the news that the Defendants had already reported the manner of Mr. Dabela's death as a suicide, *prior* to an autopsy and also prior to conducting any interviews of witnesses who may have been with or seen Mr. Dabela on the night of his death.

60. At approximately 10:00 am, over eight hours from the time of the crash, Defendant Quinn began canvasing the neighborhood of the crash scene to interview potential witnesses. By this time, it can be presumed that Defendant Killer John Doe had long since fled the area since none of the Defendants had taken steps to secure a perimeter of the area. To Plaintiffs' knowledge, Defendant Quinn's questioning of the residents did not result in anything meaningful or helpful to Mr. Dabela's death investigation.

61. Even later, around 4:00 pm, Defendant Livingston conducted his own canvasing of the neighborhood, also not resulting in anything meaningful or helpful to the investigation, to Plaintiffs' knowledge.

62. The next day, April 6, 2014, at approximately 2:15 pm, Defendant Salafia arrived at Mr. Dabela's residence to place police "do not enter" tape at the entrances to his apartment; something that was **not** done at the scene of the crash and murder.

63. Defendant Salafia later returned to Mr. Dabela's apartment with Defendant DeLuca and they searched the entire apartment. Several items were seized from the home as evidence, yet according to all of the Defendants' own reports, there was absolutely nothing inside the vehicle Mr. Dabela was killed in, besides Mr. Dabela himself and his gun, that they deemed to be possible evidence.

64. Also on April 6, 2014 and over the course of the next few days, Defendants DeLuca and Quinn interviewed friends of Mr. Dabela as well as patrons and employees of two different restaurants in which Mr. Dabela frequented, many of whom recalled witnessing Mr. Dabela at each of the two establishments on the night of his death.

65. Various friends and acquaintances informed the Plaintiffs and the Defendants that Mr. Dabela was observed visiting a third establishment that evening, The Lumberyard Pub and Sports Bar. Despite these repeated suggestions, Defendant DeLuca informed the Plaintiffs that he visited the establishment and somehow concluded that Mr. Dabela was not there the evening of his death. No surveillance video was recovered or requested from The Lumberyard to verify whether Mr. Dabela was there that evening. It has since been confirmed by witnesses as of January 2016, nearly two years after his murder, that Mr. Dabela did in fact visit The Lumberyard on the night he was murdered.

66. Virtually every witness who observed Mr. Dabela on the evening of April 4 – April 5, 2014, said that he was in his normal jovial spirits that evening and was handing out newly printed business cards for his new solo law practice that was to be initially focused on concealed pistol applications and local property tax grievances, and had discussed with one bartender his plans to take a motorcycle trip to Boston over the weekend to visit with his girlfriend. Some witnesses noted that Mr. Dabela was a "very social" and "happy go lucky" person who "showed no signs of depression".

67. Defendant DeLuca reported that he reviewed surveillance camera footage from The Little Pub and that Mr. Dabela could be seen "happily mingling throughout the bar talking to several different people" on the evening that he was killed.

68. On April 9, 2014, Defendants Quinn and Succi re-examined Mr. Dabela's vehicle, realizing that they never recovered the bullet that killed Mr. Dabela.

69. Upon re-examining the vehicle, Defendants Quinn and Succi came to the conclusion that since they could not locate the bullet in the vehicle, it must be trapped inside the driver's side seat cushion where a bullet entry hole appears but no exit hole. At that point, Defendants Quinn and Succi removed the back of the seat and took it to the police station for further inspection.

70. Once at the police station, Defendants Quinn and Succi examined the seat more closely and reportedly did not find a bullet inside, so they then deduced that the bullet that killed Mr. Dabela must have fallen out of the vehicle somehow.

71. After not locating the bullet inside the vehicle or in the seat cushion, Defendants Quinn and Succi enlisted the assistance of Special Officer Leonard to return to the scene of the

crash with a metal detector to attempt to locate the bullet. Lo and behold, a bullet was found, however **this was not the bullet that killed Mr. Dabela**.

72. The Defendants' theory that Mr. Dabela committed suicide is disproven by the following obvious facts in which the Defendants have failed to act upon or investigate after receiving verified forensic and ballistic evidence from the Connecticut State crime lab:

    a.   The bullet found outside of Mr. Dabela's vehicle at the scene of the crash was not the bullet that killed Mr. Dabela, as there was no trace of Mr. Dabela's blood nor any trace of any DNA on the bullet recovered from the scene of the crash.

    b.   One of the Defendants, presumably Killer John Doe, fired the bullet found at the scene from either Mr. Dabela's gun or a similar gun, then removed the bullet that actually killed Mr. Dabela from the scene to make it appear as though Mr. Dabela took his own life with his own gun.

    c.   Mr. Dabela's DNA was forensically compared to the DNA recovered from the trigger of his handgun, and he was excluded in two separate tests as having been a contributor to the DNA combination recovered. Therefore, someone, presumably Killer John Doe, left his DNA on the trigger of Mr. Dabela's gun when firing the shot referenced in Paragraph 73(b).

    d.   The bullet that *did* kill Mr. Dabela left a bullet hole in the seat of Mr. Dabela's vehicle which had burn characteristics that could **not** be replicated by firing the bullets contained in Mr. Dabela's gun into the same seat.

    e.   A muddy shoe print was discovered on the back of the jacket Mr. Dabela was wearing when he was killed.

f.  There was no gunshot residue found on either of the cuffs of the jacket Mr. Dabela was wearing when he was killed.

g.  Someone else, presumably Defendant Killer John Doe left hair evidence on the inside of the passenger-side window of Mr. Dabela's vehicle, which was never tested for DNA or compared to the DNA on other evidence items, such as the DNA found on the trigger of Mr. Dabela's gun.

73. Despite requesting the forensic and ballistic reports through Freedom of Information Act (FOIA) requests, Plaintiffs did not receive any crime lab reports from the Redding Police Department until October and December of 2014, and some reports were not released until as late as January of 2016, nearly two years after Mr. Dabela's death.

74. At no point in time did any of the Defendants treat the scene of the crash as a potential crime scene and therefore mishandled vital evidence that would have implicated Defendant Killer John Doe as Mr. Dabela's murderer, such as:

a.  Securing the vehicle and surrounding area of the crash as a potential crime scene;

b.  Establishing an immediate perimeter surrounding the scene of the crash to avoid evidence contamination;

c.  Establishing a neighborhood perimeter in an effort to locate any witnesses or suspects to interview;

d.  Dusting the entire vehicle for fingerprints left behind by another passenger (Defendant Livingston reportedly dusted the passenger door, center console and passenger seatbelt for fingerprints on May 2, 2014 – over a month after the murder, and could not identify any fingerprints whatsoever);

e. Gathering of any physical evidence left behind in the vehicle by another passenger;

f. Testing the hair found on the passenger window for DNA to identify who it belonged to;

g. Requesting State Police Major Crime Squad detective assistance before or after the State Crime Lab issued a report requesting DNA samples of "any suspects" developed;

75. Documented in an e-mail from a forensic evidence examiner to the State's Attorney's office dated June 14, 2014, the state's crime lab had "concerns regarding the evidence and the actions that took place on this evidence prior to coming to the Laboratory." Further, the e-mail requests to have a meeting with Defendants and the medical examiner's office to discuss the examination of Mr. Dabela's vehicle and body. Upon Plaintiffs' knowledge and belief, no such meeting ever took place.

76. During the morning of April 6, 2014, Defendant Succi reported to the Office of the Chief Medical Examiner ("OCME") to be present for Mr. Dabela's autopsy. During this time, Defendant Succi represented to Dr. Ira Kanfer, the medical examiner who was about to perform the autopsy, that there was evidence at the scene of the crash that suggested Mr. Dabela committed suicide.

77. Dr. Dabela and his family were also present in the OCME's office on the morning of the autopsy (although not present in the room where the autopsy was conducted).

78. At the conclusion of the autopsy, Dr. Kanfer reported to Dr. Dabela, his family and Defendant Succi that Mr. Dabela had most likely died instantly but his official reported

conclusion was that the cause of death was "pending further studies" and the manner of death was "pending".

79. Although various forensic and ballistic reports were received by Defendants from the state's crime lab prior to the certification of Mr. Dabela's death by the OCME, **the Defendants intentionally failed to provide _any_ forensic or ballistic reports to the chief medical examiner to assist in determining the manner of Mr. Dabela's death**, per Dr. James Gill, the Chief Medical Examiner. Based on information provided by Dr. Gill, prior to the certification of Mr. Dabela's death, the only investigative information the Defendants reported to the OCME was that the Defendants had no information or evidence that any other person had a motive to kill Mr. Dabela or was at the scene prior to the arrival of the Redding police officers. The Defendants did not provide any crime lab reports in their possession, including those which established the facts set forth at paragraph 70(a) through 70(g), referenced above.

80. On October 3, 2014, the OCME certified that the manner of Mr. Dabela's death was by suicide, and his autopsy report was then released.

81. Despite issuing the press release and speaking about the matter to media outlets throughout Connecticut, in the two years that have passed since Mr. Dabela's murder, Defendant Fuchs has never spoken with the Plaintiffs and has had very limited interaction with those seeking to assist the Plaintiffs in uncovering the truth about Mr. Dabela's killing. Those interactions are limited to:

   a. Sending one email to Plaintiff's confirming receipt of their Preservation of Evidence Request in April of 2014;

b.  Meeting with a family advisor and private investigator to discuss the family's concerns and the status of the investigation on June 5, 2014.  A meeting which Defendant Fuchs allowed on the condition that the private investigator did not meet or interview the first two responding officers, Defendants Kaufman and DeLuca;

c.  Informing the Plaintiff's advisor that the family should no longer contact Defendant Fuchs or the Redding Police Department after the June 5, 2014 meeting, except through that particular advisor;

d.  Emailing the Connecticut NAACP State President to provide a hyperlink to a very disparaging and unsubstantiated character assassination article about Mr. Dabela hastily written and published at 2:30am in a local Redding blog on the morning of the NAACP's press conference announcing their investigation on August 5, 2015; and

e.  Meeting with the Connecticut NAACP special investigative committee to discuss the case on October 22, 2015, during which Defendant Fuchs was jovial and laughing throughout the meeting and declined to answer any substantive inquiries, other than to repeatedly tell the committee members that he is in possession of some "very embarrassing" information that "could explain what really happened that night."

f.  Following up on a handful of occasions with the Connecticut NAACP special investigative committee chairperson (including from Defendant Fuchs' personal email account) seeking to coordinate the NAACP's collection of the "embarrassing information".

82. In the six weeks after Mr. Dabela's death, the Defendants left his vehicle, the crime scene, unattended, unsecure and outdoors at a local auto body shop until the Plaintiffs alerted the State's Attorney to this fact, concerned that evidence was not being preserved;

83. As a result of all of the above, Plaintiffs have expended hundreds of thousands of dollars in hiring experts, investigators and lawyers in an effort to bring justice to Mr. Dabela's murderer and to these Defendants for covering up his murder as a suicide. Plaintiffs have also endured severe emotional distress trying to convince various authorities and investigators that a wrong has been perpetuated against Mr. Dabela, his legacy and his loved ones.

### COUNT I –VIOLATION OF CIVIL RIGHTS 42 U.S. CODE § 1983
### (Denial of Due Process)

*As to Defendants the Town of Redding, Douglas Fuchs and Ryan Alcott*

84. Plaintiffs restate and incorporate by reference each and every allegation set forth in paragraphs 1 – 29 as if fully stated herein, and further allege as follows:

85. This Complaint sets forth claims for deprivation of civil rights pursuant to 42 U.S.C. § 1983 for the violation of Plaintiffs' rights under the Fourteenth Amendment of the United States Constitution.

86. Defendants are liable to Plaintiffs pursuant to 42 U.S.C. §1983, because their delay in processing Plaintiff's application for the concealed pistol permit resulted in a violation of Mr. Dabela's due process rights.

87. Mr. Dabela applied for a concealed pistol permit in January of 2013 with the Redding Police Department.

88. Defendants Fuchs and Alcott delayed the processing of Mr. Dabela's application for several weeks.

89. Mr. Dabela later in 2013 obtained a concealed firearm permit in the states of Florida and Pennsylvania without any difficulty and the information requested by Defendants Fuchs and Alcott was not sought in the license permit applications of those other states.

90. Mr. Dabela exchanged dozens of e-mails and phone calls with Defendants Fuchs and Alcott regarding the processing of his application for the CPP.

91. Defendant Fuchs informed Mr. Dabela that the processing of the application would take longer time than usual as the references provided by Mr. Dabela had to be interviewed individually.

92. There was no progress in the processing of application even after two months and Mr. Dabela did not receive any update on his application.

93. On April 9, 2013 Mr. Dabela received his permit as a result of him contacting the Commissioner of the Connecticut Department of Emergency Services and Public Protection, expressing his disappointment with his local police department's mishandling of his CPP application.

94. These actions by Defendants Fuchs and Alcott constituted an unconstitutional burden of Mr. Dabela's second amendment right to bear arms.

### COUNT II –VIOLATION OF CIVIL RIGHTS 42 U.S. CODE § 1983
### (Denial of Equal Protection)

*As to Defendants the Town of Redding, Douglas Fuchs and Ryan Alcott*

95. Plaintiffs restate and incorporate by reference each and every allegation set forth in all prior paragraphs and further allege as follows:

96. Mr. Dabela was denied equal protection of law by Defendants. Defendants delayed the processing of Mr. Dabela's application to obtain a concealed pistol permit because of his African-American ancestry and ethnicity.

97. Further, after Mr. Dabela's death, Defendants failed to conduct a proper investigation regarding the manner of death and immediately concluded the case as a suicide because Mr. Dabela was an African-American.

98. Defendant Fuchs also released a press release concluding that the death of Mr. Dabela was due to a "self-inflicted" gun shot before properly attempting to contact the decedent's family to give notice of the death.

99. Defendants' acts were the result of their racial discrimination towards Mr. Dabela who was an African-American. Had Mr. Dabela been white or a member of some other race, the police officers would have conducted a proper investigation of the murder.

100. As a direct and proximate result of Defendants blatant and outrageous discriminatory acts, the Plaintiffs have suffered damages not only compensatory but punitive damages are appropriate to be awarded for the Defendants' violation of the equal protection rights of Mr. Dabela under 42 U.S.C. § 1983.

## COUNT III –VIOLATION OF CIVIL RIGHTS 42 U.S. CODE § 1983
### (Violation of the Second Amendment Right to possess firearm)

*As to Defendants the Town of Redding, Douglas Fuchs and Ryan Alcott*

101. Plaintiffs restate and incorporate by reference each and every allegation set forth in all prior paragraphs and further allege as follows:

102. Mr. Dabela was denied his Second Amendment right to possess a firearm by Defendants.

103. Mr. Dabela had met all the requirements to obtain a permit to possess a firearm but Defendants caused unwanted and unlawful delay in processing the application submitted by Mr. Dabela.

104. Defendants requested unnecessary information that was not required for obtaining the permit. Mr. Dabela obtained a CPP's in Florida and Pennsylvania and those permits were obtained with far less procedural hurdles than in this case.

105. Mr. Dabela exchanged dozens of e-mails and phone calls with Defendants Fuchs and Alcott regarding the processing of the application. Finally, Mr. Dabela received the permit only after contacting the Commissioner of the Connecticut Department of Emergency Services and Public Protection, expressing his disappointment with Defendant Fuchs and his department's mishandling of Mr. Dabela's CPP application.

106. Defendants' delay in processing the permit application of Mr. Dabela has resulted in a violation of Mr. Dabela's Second Amendment rights to possess a firearm and has also caused damages to Plaintiffs.

## COUNT IV –VIOLATION OF CIVIL RIGHTS 42 U.S. CODE § 1983
### (Denied Right of Access to the Courts)

*As to all Defendants*

107. Plaintiffs restate and incorporate by reference each and every allegation set forth in all prior paragraphs and further allege as follows:

108. Defendants are liable to Plaintiffs pursuant to 42 U.S.C. §1983. Defendants failed to conduct a proper investigation on the incident that occurred on April 5, 2014 that resulted in the death of Mr. Dabela.

109. Defendants failed to conduct a proper investigation and a few hours after the accident, the chief of police, Defendant Fuchs, wrote a press release stating that the gunshot wound through the back of Mr. Dabela's head was self-inflicted and no one else was involved.

110. Defendants deliberately ignored evidence that provided proof of foul play in the accident. This evidence included:

- A lack of any blood or DNA on the bullet that was supposedly responsible for killing Mr. Dabela, according to the Defendants' theory of suicide;

- Mr. Dabela being excluded as a contributor to the DNA combination recovered from the trigger of his handgun;

- The DNA of another individual found on the trigger of Mr. Dabela's gun;

- A lack of gunshot residue on the cuffs of Mr. Dabela's jacket;

- The muddy shoe print left on the back of Mr. Dabela's jacket;

- The hair found on the passenger window of the car;

- The crime lab's inability to conclusively establish that the bullet submitted to the crime lab was fired from Mr. Dabela's gun; and

- The crime lab's inability to replicate the bullet hole in the car seat by firing Mr. Dabela's gun.

111. Plaintiff Dr. Dabela, Mr. Dabela's father, was informed by Defendant DeLuca that Plaintiff met with an accident and was dead. The actual cause of Mr. Dabela's death was not revealed to his father despite it already having been publicly announced to the media.

112. Defendants intentionally distorted and concealed evidence from the crime scene and caused a denial of Plaintiffs' right of access to courts.

113. Due to Defendants' intentionally concealing evidence such as the forensic and ballistic reports that incriminate Killer John Doe, intentionally failing to develop further evidence that would identify and incriminate Killer John Doe, and actively engaging in covering up the murder and calling it a suicide, Defendants, acting in concert and under color of

law, denied Plaintiffs' access to court to proceed with an action against Killer John Doe for nearly two years.

114. As a direct and proximate result of the blatant and outrageous conduct of the Defendants, the Plaintiffs have suffered damages not only compensatory but punitive damages are appropriate to be awarded, all under 42 U.S.C. § 1983.

### COUNT V –VIOLATION OF CIVIL RIGHTS 42 U.S. CODE § 1983
### (State created Danger)

*As to all Defendants*

115. Plaintiffs restate and incorporate by reference each and every allegation set forth in all prior paragraphs and further allege as follows:

116. Defendant Fuchs committed acts before Mr. Dabela's death that conveyed to his staff and the Redding community generally that he did not like Mr. Dabela because of the CCP application experience and his local advocacy about gun rights and property tax grievances. (It should be noted that in the Town of Redding, the property taxes fund the $2-3.0 million annual police budget.)

117. Defendant Fuchs voluntarily assumed the care of Mr. Dabela's death investigation by continually refusing the aid of the Connecticut State Police and withholding forensic and ballistic and other investigative results from other investigative bodies who could have intervened to render aid and identify Defendant Killer John Doe.

118. Defendant Fuchs committed acts after Mr. Dabela's death that conveyed to his staff that he would not pursue his killer, including issuing the press release stating "self-inflicted" and deciding not to provide the OCME with any forensic reports that did not support a "suicide" determination.

119. Defendants committed acts that created or increased the risk that Mr. Dabela would be exposed to an act of violence by a third party.

120. Defendants concerted with each other and emboldened the murderers by assuring them that Defendants would immediately cover up the murder of Mr. Dabela and rule it as a suicide.

121. A Defendant DeLuca informed Mr. Dabela's father that Mr. Dabela met with an accident and was dead, however, Mr. Dabela's father was not told about the gunshot as the cause of the death.

122. Defendants failed to conduct a proper investigation of the incident and deliberately avoided the valid evidences that were available at the scene of the accident.

123. Defendants failed to properly obtain and preserve evidence that would have proven that Mr. Dabela was murdered, and Defendants intentionally concealed other evidence such as the forensic and ballistic reports that incriminate Killer John Doe.

124. A few hours after the accident, Defendant Fuchs wrote a press release indicating that the gunshot that resulted in the death of Mr. Dabela was "self-inflicted" and the matter was circulated in the media.

125. Defendants failed to train their officers and did not have proper measures to ensure that violations would not take place.

126. Defendants' direct and indirect acts as well as their outrageous misconduct have resulted in a violation of Plaintiff's rights under 42 U.S.C. § 1983 and have also resulted in a state created danger to Plaintiffs.

**COUNT VI – VIOLATION OF CIVIL RIGHTS 42 U.S. CODE § 1983**
**MUNICIPAL LIABILITY**
**(Failure to Implement Appropriate Policies, Training methods and Practices)**

127. Plaintiffs restate and incorporate by reference each and every allegation set forth in all prior paragraphs and further allege as follows:

128. Defendant the Town of Redding failed to implement adequate policies, training and supervisory procedures for their employees.

129. Defendants have failed to enforce disciplinary measures that would prevent routine deprivations of citizens' rights,

130. Defendant Town of Redding's failure resulted in the improper delay in the administration of Mr. Dabela's CCP application and the violation of his constitutional rights.

131. Defendant City of Redding's failure resulted in the improper investigation of Mr. Dabela's murder by the officers and the violation of the constitutional rights of Plaintiffs.

132. Defendant City of Redding implicitly or explicitly, adopted and implemented careless and reckless policies, customs and practices that allowed the unconstitutional conduct described herein and, therefore, constitute the moving and proximate cause of the loss and death of Gugsa Dabela.

133. Defendant the Town of Redding's acts have resulted in a violation of Mr. Dabela's civil rights including his Second Amendment rights and his right to liberty.

## COUNT VII –VIOLATION OF CIVIL RIGHTS 42 U.S. CODE § 1985
### (Conspiracy)

*As to all Defendants*

134. Plaintiffs restate and incorporate by reference each and every allegation set forth in all prior paragraphs and further allege as follows:

135. The individually named Defendants concerted with each other and conspired to deny the civil rights of Mr. Dabela.

136. The individually named Defendants concerted and conspired to cover up the murder of Mr. Dabela by failing to conduct proper investigation of his death and by concealing the forensic and ballistic reports from the state crime lab to the medical examiner's office and to any other investigative body who could identify Defendant Killer John Doe.

137. Defendants deliberately ignored and spoiled the evidence at the scene of the accident which indicated foul play. Defendants ignored that there was no gunpowder residue on Mr. Dabela's sleeve cuffs, the DNA of another individual was found on the trigger of Mr. Dabela's gun, the absence of any DNA from Mr. Dabela on the bullet that was supposedly responsible for causing the death, and the muddy shoeprint on Mr. Dabela's back.

138. Defendants' conspiracy resulted in the denial of equal protection of the law to Mr. Dabela.

139. These acts of unlawful conspiracy by Defendants violated Mr. Dabela's civil rights and caused compensatory and punitive damages to Plaintiffs.

### COUNT VIII – VIOLATION OF CIVIL RIGHTS 42 U.S. CODE § 1983
### (Defamation)

*As to all Defendants*

140. Plaintiffs restate and incorporate by reference each and every allegation set forth in all prior paragraphs and further allege as follows:

141. Defendants defamed Mr. Dabela by providing information to the media without proper investigation that Mr. Dabela's death was a suicide or "self-inflicted".

142. Defendants by covering up Mr. Dabela's murder and concluding it as suicide retaliated against him for trying to obtain a concealed pistol permit and informing individual residents of the Town of Redding regarding issues of property taxes and local town budgets, including the police budget.

143. Defendants used these acts to intimidate Mr. Dabela's family and other citizens who might wish to obtain a concealed pistol permit or challenge the Redding Police Department.

144. Defendants' acts were defamatory and resulted in compensatory and punitive damages to Plaintiffs.

### COUNT IX – VIOLATION OF CIVIL RIGHTS 42 U.S. CODE § 1983
### (Wrongful Death)

*As to Defendant Killer John Doe*

145. Plaintiffs restate and incorporates by reference each and every allegation set forth in all prior paragraphs and further alleges as follows:

146. Defendant Killer John Doe maliciously fired a bullet into Mr. Dabela's person.

147. Mr. Dabela was killed as a direct and proximate result of the willful and malicious acts of Killer John Doe.

148. The Estate of Gugsa Abraham Dabela is entitled to the fair monetary value of the decedent including but not limited to compensation for the loss of his reasonably expected net income, his companionship, affection, comfort, care, guidance, counsel and advice, and are entitled to recover his reasonable funeral and burial expenses together with compensation for investigative and legal fee expenses incurred by Plaintiffs, and any other damages cognizable under the law.

### COUNT X – VIOLATION OF CIVIL RIGHTS 42 U.S. CODE § 1983

## (Intentional Infliction of Emotional Distress)

### *As to all Defendants*

149. Plaintiffs restate and incorporates by reference each and every allegation set forth in all prior paragraphs and further alleges as follows:

150. The Defendants, acting individually and in concert under the color of law, intentionally inflicted emotional distress on the family and the Estate of Gugsa Abraham Dabela.

151. Plaintiffs suffered severe emotional distress as a direct and proximate cause of the willful, malicious and intentional acts committed by the Defendants.

152. These unlawful acts committed by the Defendants violated Mr. Dabela's civil rights and caused compensatory and punitive damages to Plaintiffs.

## PRAYER AND RELIEF

**WHEREFORE**, Plaintiffs pray that this Honorable Court:

a. Enter judgment against all Defendants.

b. Enter a declaratory judgment declaring the acts of the defendant to be a violation of Plaintiff's constitutional rights to equal protection, due process, access to courts, and lawful possession of a firearm.

c. Award Plaintiffs' costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

d. Award to the Estate of Gugsa Abraham Dabela, the fair monetary value of the decedent including but not limited to compensation for the loss of his reasonably expected net income, his companionship, affection, comfort, care, guidance, counsel and advice, as well as his reasonable funeral and burial expenses together with compensation for investigative and legal fee expenses incurred by Plaintiffs, and any other damages cognizable under the law.

e.  Grant such other relief as may be just and proper.


By: */S/ Solomon M. Radner*
Solomon M. Radner, Esq. (*Pro hac vice admission pending*)
EXCOLO LAW, PLLC
Attorneys for Plaintiffs
26700 Lahser Road, Suite 401
Southfield, MI 48033
(248) 291-9712
sradner@excololaw.com


By: */S/ Felice M. Duffy*
Felice M. Duffy
Duffy Law LLC
Attorneys for Plaintiffs
770 Chapel Street, Suite 4-F
New Haven, CT 06510
(203) 946-2000
felice@duffylawct.com

Dated: April 5, 2016