UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ESTATE OF GUGSA ABRAHAM
DABELA, et al.

                              Plaintiff,

v.

TOWN OF REDDING, et al.,

                              Defendants.

Case No. 3:16-CV-00534-RNC

Hon. Robert N. Chatigny

---

**SUPPLEMENTAL BRIEF AS TO DENIAL OF ACCESS CLAIMS**

---

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................. ii

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ............................................................................................1

ANALYSIS ......................................................................................................1

I.    *Oliva v. Town of Greece* ......................................................................1

II.   *Sousa v. Marquez* ................................................................................5

III.  *Christopher v. Harbury* .......................................................................7

IV.   What Have Other Circuits Stated? .........................................................8

      *Delew v. Wagner*, 143 F.3d 1219 (9th Cir. 1998): ............................9

      *Swekel v. City of River Rouge*, 119 F.3d 1259 (6th Cir. 1997)........9

      *Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983) ...........................10

V.    Where Does That Leave Us .................................................................10

      Evidence Supporting the Predicate Claim .........................................10

      Acts or Omissions Hindering Access to the Courts..........................11

      Causal Connection Between Defendants' Acts and the Loss of Legal Remedy

      ...........................................................................................................12

VI.   Defendants' Rule 56 Statements ..........................................................12

ii

VII.     Equal Protection Abatement Principal Inapplicable................................12

CONCLUSION ....................................................................................................13

CERTIFICATE OF SERVICE ............................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Christopher v. Harbury*, 536 U.S. 403 (2002)................................................... 1, 2, 7

*Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003).....................................................2

*Delew v. Wagner*, 143 F.3d 1219 (9th Cir. 1998).......................................................9

*Lewis v. Casey*, 518 U.S. 343, 349, 351, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996)

.................................................................................................................................3

*Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 1997) ...........................................2

*Oliva v. Town of Greece*, 630 F. App'x 43 (2d Cir. 2015).....................................1, 2

*Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983) ....................................................10

*Sousa v. Marquez*, 702 F.3d 124 (2d Cir. 2012).....................................................1, 5

*Swekel v. City of River Rouge*, 119 F.3d 1259 (6th Cir. 1997).................................9

**Statutes**

42 U.S.C.S. §1983......................................................................................................1

**Rules**

Fed. R. Civ. P. 12(b)(6)..............................................................................................2

NOW COMES Plaintiff, by and though counsel, and states as follows:

## INTRODUCTION

During the Telephonic Status Conference on October 15, 2024, the Court directed the parties to submit supplemental briefing on Plaintiff's denial of court access claims, specifically addressing three cases: *Oliva v. Town of Greece*, 630 F. App'x 43 (2d Cir. 2015); *Sousa v. Marquez*, 702 F.3d 124 (2d Cir. 2012); and *Christopher v. Harbury*, 536 U.S. 403 (2002).

Plaintiff will discuss these cases herein one at a time, with the following spoiler alert: The law is largely the same, and there still exist triable issues.

As discussed below, Plaintiff's claims satisfy all legal requirements and merit further adjudication because the claims arise from documented evidence of active misconduct by defendants that materially obstructed Plaintiff's ability to identify and pursue claims against those responsible for the murder of Mr. Gugsa Abraham ("Abe") Dabela. In contrast, the cited cases involved speculative injury, insufficient causation, and inadequate underlying claims, none of which apply here. Plaintiff's claims satisfy all legal requirements and merit further adjudication.

## ANALYSIS

### I.  *Oliva v. Town of Greece*

In *Oliva*, claims under 42 U.S.C.S. §1983, alleging that defendants had violated plaintiffs' constitutional right of access to courts by recklessly or

1

intentionally failing to properly investigate the tragic death of their young daughter, were dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because plaintiffs failed to allege the requisite injury resulting from the alleged government misconduct to state a right-of-access claim. Plaintiffs' conclusory assertions were not sufficient to plausibly allege causation.

*Oliva* holds that to succeed in an access to courts claim, a plaintiff must show that the defendant caused the plaintiff injury or put less succinctly, that the defendant took or was responsible for actions that had the actual effect of frustrating the plaintiff's effort to pursue a legal claim. *see Harbury*, 536 U.S. at 415 ("[T]he [access] right is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court."); *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (discussing this actual injury requirement); *Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 1997) ("In order to establish a violation of a right of access to courts, a plaintiff must demonstrate that a defendant caused 'actual injury,' *i.e.*, took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim.'" (citation omitted) (quoting *Lewis v. Casey*, 518 U.S. 343, 349, 351, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996)) (alteration in original)).

Here, the Plaintiffs allege in their complaint that "the reckless or intentional failure [of the Defendants] to investigate the fatal accident . . . prevented plaintiffs from obtaining damages from the other parties whose actions may have contributed to the collision such as the entities who were working on . . . Route

2

104," J.A. 26-27, ¶ 128, and that "[a]s the direct and proximate result of defendants' actions, plaintiffs have been deprived of their full ability to prove the extent of their damages in a civil action against the drivers of the vehicles involved in the accident," J.A. 27, ¶ 129. These conclusory assertions, which are undercut by other allegations in the complaint, appended to it, or incorporated within it, are not sufficient to plausibly allege causation.

However, applying the Court's reasoning in *Oliva* to the case at hand, supports a vastly different outcome. In the case at hand, Plaintiff is not merely alleging that the police refused to properly investigate the death of the decedent, but that the police actively covered it up, the result of which the murderer was never found. The strongest distinction between *Oliva* and the case at hand is that in the case at hand there is ample evidence that the police defendants actively covered up the murder of Mr. Dabela. The mistruths and improper actions taken by the police cannot possibly be explained away by mere recklessness or incompetence. For example, who first labeled it a suicide? The police or the Medical Examiner? They each point their finger at each other, so at least one of them is lying as a cover-up.

In the present case, Plaintiff alleges specific and deliberate actions and inactions by defendants that caused actual injury by preventing the identification of Mr. Dabela's killer(s), directly obstructing the plaintiff's pursuit of legal remedies in the form of wrongful death cause of action (and potentially other

3

claims if the killer was a police officer or other municipal employee). Examples of these specific and deliberate actions and inactions include:

**Misclassification of death**: The defendants immediately and falsely labeled Mr. Dabela's death as a "suicide" without sufficient evidence, a conclusion subsequently contradicted by physical evidence and expert analysis already in the record.

**Labeling of the Crime Scene:** In Connecticut, all homicides must be handled by the State Police. Before Mr. Dabela's body had left the crime scene, the Chief of Police had called the Captain and asked whether the State Police needed to be called in. The Captain responded "no". How could he conclude at the time of the incident that no crime had been committed, and the State Police did not need to be called in to conduct the initial scene investigation?

**Conflicting reports**: The defendant police officers and the medical examiner gave conflicting accounts of who determined that "suicide" was the manner of death, indicating deception.

**Suppressed and spoiled evidence**: Key forensic evidence, such as DNA on the trigger and available cellphone tower data, was either ignored or mishandled, preventing identification of persons present at the scene of Mr. Dabela's death before and during the scene response, which evidence would have captured cellphone data of the perpetrator(s). Specifically, the forensic report could not match the bullet recovered to Mr. Dabela's gun. In addition, there were three

4

DNA profiles recovered from the trigger of Mr. Dabela's gun, none were those of Mr. Dabela.

**Denial of Statements:** The record shows that in the immediate aftermath of the death of Mr. Dabela, the Dabela family spoke with a defendant police officer who informed them that he carried the same gun as the one recovered at the scene. The officer then denied the statement when testifying at his deposition, indicating that he was lying in one of those conflicting statements.

**Absence of blood or DNA on the only recovered bullet**: This critical anomaly, left unaddressed, suggests that key evidence proving homicide was withheld or overlooked.

Unlike in *Oliva*, Plaintiff's allegations are replete with specific facts and evidence, demonstrating actual injury caused by defendants' deliberate cover-up of Mr. Dabela's death by homicide. This includes expert testimony providing that the death of Mr. Dabela was more likely a homicide.

## II.  *Sousa v. Marquez*

The appellate court in *Sousa* determined that the employee's backward-looking right of access claim, even if recognized, failed because (1) the employee, claiming that the government concealed or manipulated relevant facts, was aware at the time of the earlier lawsuit of the facts giving rise to his claim since he was necessarily aware of the alleged inaccuracies in the attorney's reports at the time he litigated his prior suit and he had an opportunity to expose those inaccuracies

through discovery and argument before the district court, and (2) he failed to show the requisite injury resulting from the attorney's reports to state a right-of-access claim since the district court's prior decision did not rely at all on the reports.

The strongest distinction between *Sousa* and the case at hand is the *Sousa* plaintiff's knowledge of the defendant's alleged misconduct. In *Sousa*, the plaintiff knew what was concealed; in the case at hand, the defendants' successfully actively covered up a murder, thereby denying the plaintiff an opportunity to go after the murderer in court. *Sousa* would theoretically be analogous to the case at hand if for example during the course of discovery, Plaintiff would have uncovered a memo in which the defendant police officers indicated that the murderer was likely John Doe and the plaintiff otherwise had available to it evidence that he is the likely killer. However, as it stands, the police defendants cover up of Mr. Dabela's murder was so complete and successful, that the Plaintiff has no such knowledge or evidence unlike the *Sousa* plaintiff. Examples of critical facts actively covered up by the Defendants include (but are not limited to):

   • That they failed to obtain or suppressed key forensic evidence that could have identified the perpetrator(s), including cell tower data, still unidentified DNA from the trigger, and the still unaccounted for fatal bullet.

   • They withheld forensic reports contradicting suicide from the medical examiner prior to his classification of the manner of death.

These actions directly prevented Mr. Dabela's death from being investigated as a homicide and prevented Plaintiff from uncovering the identity of the perpetrator(s) and pursuing legal claims, such as wrongful death and §1983 claims, in a timely manner.

To date, Plaintiff is still being denied the opportunity to sue the killer(s) in court.

### III.   *Christopher v. Harbury*

In *Harbury*, the widow claimed that the defendants concealed information that the decedent was being detained and tortured by foreign government agents who were sponsored by the officials, in order to obtain information of interest to the defendants. The widow vaguely contended that such concealment precluded her from seeking judicial injunctive relief to prevent the decedent's death. The United States Supreme Court held, however, that no claim for denial of access to the courts was stated since the widow failed to identify the underlying cause of action, which was allegedly precluded from pursuing, and failed to seek any relief on the denial to access to the courts that would be unavailable otherwise. The widow's bare allegation that she was prevented from seeking legal redress did not identify the basis upon which such redress would have been available. Further, even assuming that a cause of action such as intentional infliction of emotional distress was available to provide injunctive relief, the death of the dissident obviated the need for such relief and any other remedies for the defendants'

7

alleged misconduct remained available without asserting a claim for denial of access to the courts.

First, the *Harbury* Court's analysis was in the context of *Bivens*, since the defendants were federal employees. *Bivens* and its often-impossible requirements, thankfully, do not apply in the case at hand. Second, the claims that could have been brought against the unknown killer in the case at hand, but for the defendants' actively covering up any chance of the plaintiff uncovering his/her/their identities, are easily describable, as opposed to in *Harbury*. The claims that could have been brought in the case at hand, had the defendants not actively covered up Mr. Dabela's murder, consist of claims that relate to wrongful death, or if the killer was a police officer, claims under 28 USC §1983 that relate to Mr. Dabela's murder.

Plaintiff's claims against the defendants involve deliberate, obstructive actions that directly precluded legal remedies, satisfying the requirements of a denial of access claim.

## IV.  What Have Other Circuits Stated?

Other federal circuits, when presented with similar factual allegations, have found systemic investigative failures and deliberate obstruction by law enforcement to constitute constitutional violations in cases presenting facts strikingly similar to the present case. As such, Plaintiff respectfully requests that this honourable court consider the guidance of such decisions.

**_Delew v. Wagner_, 143 F.3d 1219 (9th Cir. 1998):**

*In Delew v. Wagner,* the Ninth Circuit recognized a constitutional violation of the right to court access where law enforcement engaged in a deliberate cover-up to shield the perpetrator of a fatal accident, which perpetrator was the wife of a police officer. The misconduct alleged included failing to collect evidence and intentionally undermining an investigation. The Court in *Delew* established that systemic obstruction by law enforcement, such as suppressing evidence and undermining investigations, constitutes a violation of court access rights. The parallels to this case are striking. In this case, the defendants' deliberate misclassification of Mr. Dabela's death and suppression of critical evidence mirror the obstruction in *Delew*, strengthening the Plaintiffs' denial of access claim.

**_Swekel v. City of River Rouge_, 119 F.3d 1259 (6th Cir. 1997):**

In *Swekel v. City of River Rouge*, the Sixth Circuit addressed intentional interference by law enforcement that prevented the plaintiff from identifying and suing a second driver before the statute of limitations expired, which second driver was the son of a police officer. The court in *Swekel* held that such interference violated the plaintiff's right to access the courts but required a showing that the plaintiff had exhausted all available state remedies before allowing the federal claim to proceed. Unlike in *Swekel*, the Plaintiff here pursued all available avenues as evidenced by Exhibit A attached hereto, but the

9

defendants' deliberate obstruction rendered all available remedies ineffective under Connecticut law, which does not recognize "John Doe" lawsuits.

### *Ryland v. Shapiro*, 708 F.2d 967 (5th Cir. 1983):

In *Ryland v. Shapiro*, the Fifth Circuit held that deliberate concealment of evidence by law enforcement (including the misclassification of the death as a suicide by self-inflicted gunshot), preventing the plaintiffs from discovering that their daughter was murdered by a state prosecutor, violated the plaintiff's fundamental right of court access. The *Ryland* court also emphasized that administrative or investigative acts, such as suppressing evidence and misrepresenting facts, are not protected by immunity. Similarly, the defendants' intentional suppression of evidence and active misrepresentation of Mr. Dabela's death align squarely with *Ryland*, warranting judicial intervention.

## V.  Where Does That Leave Us

### Evidence Supporting the Predicate Claim

The predicate claim here is a wrongful death action against an individual responsible for the death of Mr. Dabela, referred to as "Killer John Doe." The evidence demonstrates:

- Expert analysis indicating investigative deficiencies, including mishandling of forensic evidence, misclassification of the death as a suicide, and failure to secure the scene adequately.

- Statements and evidence that the shooter may have been a known individual, including law enforcement personnel, which the investigation neglected to pursue.

- Allegations of racial bias influencing the misclassification of the death, which directly undermines any presumption of fairness in the investigation.

These points establish that the predicate claim is nonfrivolous and would have had a reasonable chance of success if the investigation had been conducted properly.

<u>Acts or Omissions Hindering Access to the Courts</u>

The Defendants' failure to investigate effectively prevented the Plaintiffs from gathering necessary evidence to support their wrongful death claim. Specific omissions include:

- Failure to obtain cell tower data, which would have definitively established a timeline for, and identification of individuals likely present at, the crime scene.

- Failure to test forensic evidence thoroughly, such as ballistics or DNA evidence on the gun and holster.

- Suppression of key witness testimony, as suggested by procedural irregularities in interviews and evidence handling.

- The premature conclusion that the death was a suicide without investigating other plausible scenarios, despite contradictory evidence.

- The unjustifiable continuation of such misclassification as suicide despite forensic evidence to the contrary.

- The withholding of forensic reports contradictory to suicide from the medical examiner and experts and investigators retained by the Dabela family.

These failures are not merely procedural but constitute active barriers to the Plaintiffs' ability to obtain justice.

<u>Causal Connection Between Defendants' Acts and the Loss of Legal Remedy</u>

The causal link is clear: the Defendants' investigative failures foreclosed the Plaintiffs' ability to identify and pursue the responsible party. "But for" these omissions:

- The identity of the shooter would more likely than not have been ascertained.

- The Plaintiffs could have presented evidence to substantiate their wrongful death claim in a court of law.

The obstruction of this process directly resulted in the denial of the Plaintiffs' ability to seek redress.

## VI.    Defendants' Rule 56 Statements

The parties have come to an agreement in which Defendants have agreed to remove all statements of material fact which were not incorporated into the brief.

## VII.    Equal Protection Abatement Principal Inapplicable

12

The court has indicated concerns that the equal protection claim "was brought on behalf of Mr. Dabela and his right to an unbiased investigation, which did not survive his death" resulting in the dismissal of the equal protection claim. The abatement principle does not apply for the following reasons: The right to an unbiased investigation inherently arises after death in cases such as this. It is not a personal claim limited to the decedent's experiences but one that directly impacts the Estate's ability to seek justice and legal remedies. Extending the doctrine of abatement to rights that arise posthumously contradicts their purpose of ensuring justice for the deceased's estate and family. Should this honourable court deem additional briefing helpful, Plaintiff requests additional pages for briefing on equal protection be granted.

## CONCLUSION

The cases cited by the Court—*Oliva*, *Sousa*, and *Harbury*—do not bar Plaintiff's claims. Each of these cases is distinguishable from the present matter, which involves deliberate documented actions by defendants that actively obstructed justice and caused concrete injury to Plaintiff.

Defendants' misconduct—ranging from suppressing forensic evidence to misrepresenting the manner of death—directly and inarguably prevented Plaintiff from identifying the perpetrator(s) and pursuing actionable claims. Unlike in the cited cases, Plaintiff's allegations are supported by specific facts, demonstrating actual injury and causation.

It is for a trier of fact to determine whether collection, preservation and investigation of the cell tower records at such a remote location, at such a late-night hour, coupled with the fatal bullet and a partial DNA sample, and a robust, homicide investigation would more likely than not have identified the person(s) that caused Mr. Dabela's death.

For these reasons, Plaintiff respectfully requests that the Court find these allegations sufficient to support a denial of court access claim and permit this matter to proceed to trial.

Dated: January 17, 2025             Respectfully Submitted,

                                    */s/ Keith Altman*
                                    Keith Altman, Esq.
                                    The Law Office of Keith Altman
                                    33228 West 12 Mile Road, Suite 375
                                    Farmington Hills, MI 48334
                                    (248) 987-8929
                                    keithaltman@kaltmanlaw.com
                                    *Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 17th day of January 2025, I served all opposing counsel with a copy of the foregoing document, by filing same with the Clerk of Court using the CM/ECF system which will send notification of such filing electronically to all counsel of record.

*/s/ Keith Altman*

Keith Altman, Esq.

# EXHIBIT A



**State of Connecticut**
DIVISION OF CRIMINAL JUSTICE

OFFICE OF
THE CHIEF STATE'S ATTORNEY

PATRICK GRIFFIN
CHIEF STATE'S ATTORNEY

300 CORPORATE PLACE
ROCKY HILL, CONNECTICUT 06067
PHONE (860) 258-5800  FAX (860) 258-5858

September 20, 2024

Albab Dabela
244 Madison Avenue
New York, NY 10016

Re: Request for Investigation

Dear Attorney Dabela,

The Office of the Chief State's Attorney is in reciept of your correspondence dated September 14, 2024. Your correspondence relates to concerns surrounding the untimely death of your brother, Gugsa Abraham Dabela on April 5, 2014.

Specifically, you request this agency review the previous investigation undertaken by the State's Attorney for the Judicial District of Danbury.

The Office of the Chief State's Attorney has already conducted a review of this matter. A copy of the report authored by EASA Gail Hardy regarding this matter was delivered to your attorney, Felice Duffy, on June 20, 2022. I have attached an additional copy of that report to this correspondence.

Given the report's findings and conclusions, the Office of the Chief State's Attorney will not undertake further review of this incident.

Sincerely,

Kevin D. Lawlor
Deputy Chief State's Attorney – Operations

cc:  David Applegate, Danbury Judicial District State's Attorney
     EASA Gail Hardy, Office of the Chief State's Attorney

Enc:  Review of Death Investigation of Attorney Gugsa "Abe" Dabela, March 28, 2022



OFFICE OF
**THE CHIEF STATE'S ATTORNEY**
300 CORPORATE PLACE
ROCKY HILL, CONNECTICUT 06067
PHONE (860) 258-5800    FAX (860) 258-5858

# 𝔐𝔢𝔪𝔬𝔯𝔞𝔫𝔡𝔲𝔪

---

TO:        Richard J. Colangelo, Jr.
              Chief State's Attorney

FROM:     Gail P. Hardy
              Executive Assistant State's Attorney

DATE:     March 28, 2022

RE:        Review of the Death Investigation of Attorney Gugsa "Abe" Dabela

At your request, I have reviewed the box of materials given to me, documenting the investigation surrounding the April 5, 2014, death of Attorney Gugsa "Abe" Dabela. The purpose of my review was to determine if the evidence and circumstances establish sufficient proof to believe that Attorney Dabela's death should have been ruled a homicide.

BACKGROUND

On April 5, 2014, at approximately 1:39 a.m., a motorist dialed 911 to report an overturned vehicle in the area of Umpawaug Road near Wayside Lane in Redding, Connecticut. First responders, including Redding police officers, emergency medical personnel from Georgetown Ambulance and Georgetown Fire Department arrived on the scene to find a silver, Mercedes Benz ML sport utility vehicle, bearing Maryland registration AET14F, on its roof, facing southbound in a grassy area off the east side of the road. Officers reported that the vehicle's driver's door was closest to the roadway and slightly open, but wedged to the ground. The passenger side of the vehicle came to rest alongside a low stone wall. The window on the driver's door was smashed. The windshield was broken, but all the other windows were intact. The driver's side seatbelt was extended, consistent with the operator wearing it during the crash; while the passenger's side seatbelt was retracted tightly, indicating that it was not latched at the time of the crash. The airbags had not deployed; and all four tires were inflated.

There was one person inside the vehicle, 34-year-old Gugsa "Abe" Dabela, who was identified by his driver's license. He was unresponsive and bleeding from an open head wound.

Review of Death Investigation: Attorney Gugsa "Abe" Dabela
Page 2
March 28, 2022

He was supine and lying slightly on his left side. As police attempted to remove him from the vehicle, they observed that a gun holster was snagging the steering wheel. They were able to manipulate the holster and remove Mr. Dabela from the vehicle to commence life-saving measures. It was at that time that officers saw a firearm near Mr. Dabela's body. Emergency medical technicians continued resuscitative efforts, with assistance from police officers. They attached an automated external defibrillator to Mr. Dabela's chest, but it did not deliver a shock. CPR was performed by the officers without success. Mr. Dabela was pronounced dead at 2:11 a.m.

Redding Police noted that Mr. Dabela's body remained on scene in an ambulance waiting for the Chief Medical Examiner's Office to arrive. The officers summoned the police department's photographer and the accident reconstructionist to the scene. As the photographer took pictures and diagramed the scene, officers seized a Springfield Armory XD40 sub compact .40 caliber pistol, bearing Serial Number US354660 which was near Mr. Dabela's body. A tow truck company was called to remove the vehicle from the scene until it could be processed. A large blue tarp was placed on the ground near the driver's side of the vehicle to catch any items that might fall from the vehicle when it was rolled over onto its tires. On top of a piece of bloody paperwork that fell onto the tarp was a spent .40 caliber shell casing. The bullet casing was consistent with those in the magazine. Once the department's photographer began to photograph Mr. Dabela's injuries, officers were able to more closely inspect his head injury, which appeared to be more consistent with a gunshot wound. They noted what appeared to be an entry wound on the right side of his head above and behind his right ear. On the left side of his head, just above and behind his left ear, was a larger wound, believed to be an exit wound. His right eye appeared to be swollen. Based upon these observations, officers bagged Mr. Dabela's hands and requested that the medical examiner collect a gunshot residue sample. Reports, however, indicate that the sample was not taken.

On April 5, 2014, at 3:45 a.m., Redding Police went to the address in Redding that was on the pistol permit found in Mr. Dabela's vehicle. They made a death notification to his landlord, who provided contact information for his parents who lived in Maryland. At 7:00 a.m., Redding Police contacted the Riverdale, Maryland Police to request assistance with the death notification. Mr. Dabela's father called the Redding Police at 7:30 a.m. and received notification that his son died in a car crash.

Redding Police Chief Douglas Fuchs issued a press release on the morning of April 5, 2014, noting the rollover crash on Umpawaug Road. The release identified Mr. Dabela as the sole operator, who was dead from a gunshot wound to the head. The release continued, "At this time, it does not appear that there is anyone else involved in this incident and that the gunshot wound was self-inflicted." The press release noted that an autopsy was scheduled for that day (April 5, 2014), however it was not actually performed until April 6, 2014. Dr. Ira Kanfer, an Associate Medical Examiner at the Office of the Chief Medical Examiner certified the cause of death to Gugsa Dabela to be "Gunshot Wound of Head," and the manner of death to be "Suicide." A toxicology report released on May 21, 2014, showed Mr. Dabela's blood alcohol concentration to be .20 at the time of his death.

Review of Death Investigation:  Attorney Gugsa "Abe" Dabela
Page 3
March 28, 2022

Gugsa Dabela's family took issue with the police chief declaring their son's death a suicide so soon after his death—before an investigation was done, and before an autopsy was performed. They noted that their son was optimistic about opening his own law practice and showed no signs of wanting to end his life.  However, they also knew of his difficulty with securing a pistol permit (which required the police chief's approval); issues he had with other town officials; and emails that he had sent to his family regarding some of his more contentious cases.  They also knew that he was a black man living in a town of predominately white residents.

The family of Gugsa Dabela requested that the case be removed from the jurisdiction of the Redding Police Department and turned over to the Connecticut State Police.  They were concerned that the Redding Police Department lacked the experience to investigate homicides; and felt that they were biased against Mr. Dabela, and that they had already compromised the investigation by presuming that he committed suicide.  They asked the FBI get involved.  They hired an attorney, a reconstruction expert and they involved the Connecticut state chapter of the NAACP who opened their own investigation.

Danbury State's Attorney Stephen J. Sedensky III enlisted the services of the Connecticut State Police Western District Major Crime Squad to review the accident reconstruction report prepared by the Redding Police and to prepare a "Bloodstain Pattern Analysis."  He directed the Redding Police and the Connecticut State Police Forensic Laboratory to cooperate with the Dabela family's attorneys and their investigators in their independent investigation.  He asked that pieces of evidence be sent for testing or additional testing, to be able to answer questions posed by Mr. Dabela's family.  He recommended that the family contact the Office of the Chief Medical Examiner if they had questions concerning the autopsy findings.  State's Attorney Sedensky also sent his inspector to canvass for witnesses who the Redding Police were unable to contact and to re-interview persons who saw Mr. Dabela shortly before his death.

<u>CHIEF STATE'S ATTORNEY'S REVIEW</u>

In February of 2021, the sister of Gugsa Dabela contacted Chief State's Attorney Richard J. Colangelo, Jr., requesting a review of the investigation into the death of Gugsa Dabela.  Her email included investigative steps that she thought should be taken; reports prepared by police officials and privately retained experts; and a report prepared by Dr. Albert Harper, who was retained by the family to investigate and reconstruct the circumstances leading to the death of Gugsa Dabela.

Deputy Chief State's Attorney Kevin D. Lawlor received the investigative file from the Danbury State's Attorney on March 18, 2021.  After a review of the materials, Deputy Chief State's Attorney Lawlor arranged for a meeting with the Collision, Analysis and Reconstruction Squad (CARS) of the Connecticut State Police.  Unfortunately, a meeting scheduled for May 10, 2021, had to be cancelled as the trooper was out of work due to an injury.  In August of 2021, the State Police notified the Office of the Chief State's Attorney that a different reconstructionist

Review of Death Investigation:  Attorney Gugsa "Abe" Dabela
Page 4
March 28, 2022

would be assigned.  Deputy Chief State's Attorney Lawlor also reached out to Acting United States Attorney Leonard C. Boyle, who confirmed that the United States Attorney's Office reviewed the facts and circumstances surrounding Gugsa Dabela's death and concluded that no further federal criminal investigation was warranted.

REVIEW

I reviewed all reports and supplemental reports prepared by the Redding Police Department and Connecticut State Police.  I reviewed every piece of correspondence between the Dabela family and the Danbury State's Attorney and Office of the Chief State's Attorney.  I watched a 2016 episode of "Crime Watch" that focused on the death of Gugsa Dabela.  I searched the Internet for information relative to this case, including:

*NAACP Launches Investigation into Death of Redding Man* (August 6, 2015);

*Family Seeks Answers in 2014 Death of Gugsa Abraham Dabela* (Wall Street Journal, August 6, 2015); and

Justice4Abe website (including all press releases).

On October 28, 2021, Deputy Chief State's Attorney Lawlor and I met with Sergeant Mark DiCocco, supervisor of the CARS Unit, who reviewed the reconstruction performed by Redding Police.  He noted that the crash was a "survivable" crash, as there was no ejection.  In his report dated November 18, 2021, he noted the following:  "The causative factor in this collision was that Dabela failed to drive within the confines of the established and delineated northbound lane of Umpawaug Road.  A contributing factor in this collision was that Dabela was operating the Mercedes Benz ML 350 under the influence of alcohol."

I reviewed a crime scene reconstruction report of the incident performed by the Connecticut State Police Western District Major Crime Squad.  *Crime Scene Reconstruction* was defined in the report as "an examination of scene context, documentation, physical evidence, medicolegal findings, laboratory testing and experimentation in order to determine the events comprising an incident and their sequence."  In his report dated March 24, 2016, Connecticut State Police Sergeant Mark Davison noted the limitations of his analysis.  However, such limitations related primarily to the creation and alteration of bloodstains, and the movement of items in the vehicle after the vehicle had been returned to its wheelbase.

In reconstructing the scene, Sergeant Davison established six events comprising the incident which he labeled as follows:

A.  Motor Vehicle Crash
B.  Gunshot Event
C.  Bloodshed Event

Review of Death Investigation:  Attorney Gugsa "Abe" Dabela
Page 5
March 28, 2022

    D.  Motor Vehicle Operation
    E.  Removal of Decedent from Vehicle
    F.  Collection of Physical Evidence at the Scene

The issue he sought to resolve was the order of the motor vehicle crash; the bloodshed event; and the gunshot event, with six possible outcomes:

1.  A,B,C
2.  A,C,B
3.  B,A,C
4.  B,C,A
5.  C,A,B
6.  C,B,A

Clearly, the motor vehicle would have to have been operated for a crash to occur; and the decedent would be removed from the vehicle, and physical evidence collected after the crash, gunshot and bloodshed events had taken place.

In reliance upon reports from the first responders at the scene documenting the position of the vehicle; damage to the vehicle; the position of Mr. Dabela in the vehicle; the Connecticut State Police Western District Major Crime Squad's "Bloodstain Pattern Analysis" of blood found within the vehicle; the Medical Examiner's post-mortem report and photographs documenting Mr. Dabela's injuries, and the immediate incapacitating effect of his injuries, Sergeant Davison noted the "best explanation" of events to be:  The motor vehicle crash, followed by the gunshot event and then the bloodshed event—or A, B, C.

His analysis was supported by the following:

"**Data Relationship/Analysis**:  The decedent sustained two injuries that were sources of blood, the entry wound and the exit wound, both related to the gunshot. The Chief Medical Examiner stated that the gunshot wound was immediately incapacitating.  The Bloodshed Event can therefore be eliminated from occurring prior to the Gunshot Event.  This eliminates sequences 2, 5 and 6 above.  The engagement of the seatbelt restraint system is consistent with the seatbelt being worn at the time of impact.  The drip and spatter stains on the glove, ceiling light fixture and ceiling lining are related to the gunshot.  The void on the ceiling lining indicates that the glove was in this position prior to the gunshot and that it arrived in this position as a result of the rollover crash.  The post-crash functionality of the seatbelt buckle and the receptacle indicate that the release of the buckle was the result of a manual manipulation.  As a result of the gunshot injury, the decedent was incapable of unbuckling the seatbelt.  This indicates that the seatbelt must have been unbuckled prior to the gunshot.  The gunshot event is eliminated as occurring

Review of Death Investigation: Attorney Gugsa "Abe" Dabela
Page 6
March 28, 2022

prior to the crash. This eliminates the Gunshot Event from preceding the Motor Vehicle Crash and sequences 3 and 4 above."

Additional conclusions drawn from the reconstruction report prepared by Sergeant Davison included the following, which were based upon investigative questions that he sought to answer:

1.  Gugsa Dabela was the operator and sole occupant of the vehicle at the time of the crash.

    In arriving at this conclusion, Sergeant Davison utilized video from the establishment where Mr. Dabela was prior to the accident; and from interviews that police conducted with patrons of the establishment. There was also no evidence of exit, entry or occupancy of the vehicle by another party.

2.  The recovered casing was from Mr. Dabela's firearm.

    In arriving at this conclusion, Sergeant Davison noted that a single gunshot caused Mr. Dabela's injuries, and no other gunshots were identified; and no additional casings were recovered within the vehicle or from the scene. This casing was recovered from the blue tarp placed next to the driver's window prior to the vehicle being up-righted. A laboratory comparison of the recovered casing with known casings (produced by firing the recovered firearm and ammunition) determined that the casing was "consistent" with known casings produced by the recovered firearm.

3.  The recovered bullet inflicted Mr. Dabela's head injury.

    A bullet was found in the dirt at the scene which was not believed to have fallen from the up-righted vehicle. It was believed to have come to its place of rest as a result of the bullet's trajectory or it was thought to be incidental to the removal of Mr. Dabela's body. No tissue, blood or detectable DNA was found on the bullet. However, Sergeant Davison pointed out that the heat produced by the discharge of a firearm, as well as the bullet's exposure to the environment, would be destructive to cellular material. Nevertheless, he examined the defects on the bullet and the path that it would travel in perforating the right side of Mr. Dabela's skull, his brain and then the left side of his skull and concluded that the recovered bullet inflicted Mr. Dabela's head injury.

4.  The recovered bullet was fired from Mr. Dabela's firearm.

    A laboratory comparison of the bullet recovered from the scene with a known bullet produced by firing the recovered firearm and ammunition determined that there was an agreement of class characteristics. "Eliminations are almost

Review of Death Investigation:  Attorney Gugsa "Abe" Dabela
Page 7
March 28, 2022

exclusively based on a disagreement of class characteristics."   General rifling
characteristics eliminate Glock firearms (such as those carried by Redding police
officers) from having fired the recovered bullet.   Additionally, the bullets in the
cartridges removed from the firearm were consistent with the recovered bullet.

5.  The bullet traveled from inside the vehicle towards the exterior.

Sergeant Davison relied on bloodstain analysis from Mr. Dabela's hands, his
clothing, the seized firearm, items in the vehicle, blood spatter within the vehicle
and the entry and exit wounds on his body in arriving at the conclusion that the
bullet traveled from inside the vehicle towards the exterior.

Sergeant Davison concluded his reconstruction report with the following summary:

"Within the limitations of this analysis, the evaluation of available data relating to
the events comprising this incident establishes that the motor vehicle crash
preceded the gunshot event.   The gunshot event resulted in bloodstain spatters
within the vehicle and on the decedent and his clothing that were subjected to a
limited analysis based on the scene documentation and the circumstances
surrounding the recovery of evidence.   Inferences derived from the available data
based on the evaluation of the investigative questions are a best explanation of that
data.   These explanations indicate that the recovered casing and the recovered bullet
were fired from the recovered firearm, which was owned by the decedent.   The
recovered bullet inflicted the decedent's head injuries.    These explanations
eliminate the presence of another firearm at the scene and implicate the recovered
bullet as the fatal wounding mechanism.   Significantly, the decedent was the sole
occupant and the operator of the vehicle at the time of the crash.   The only evidence
of another person in this incident is contained in the additional DNA profiles on the
firearm which are not conclusive of actions or attendance at the scene.   Based on
the defined sequence of events and the incorporation of the inferences generated by
the evaluation of investigative questions against causation criteria, the best
explanation of the data indicates that the decedent fired the firearm and that the
gunshot wound was self-inflicted."

State's Attorney Sedensky issued a press release on April 8, 2016, that his office was
continuing its investigation into the 2014 death of Gugsa Dabela with the assistance and
cooperation of the Redding Police Department and the Connecticut State Police.  He further noted
that his investigation up to that point revealed no evidence of a conspiracy on the part of the
Redding Police.  State's Attorney Sedensky stated that he issued the press release to dispel false
and misleading information that was circulating in the media surrounding this incident.

On May 31, 2017, State's Attorney Sedensky met with the family of Gugsa Dabela to
explain his findings.  Then, on June 6, 2017, State's Attorney Sedensky issued another press

Review of Death Investigation:  Attorney Gugsa "Abe" Dabela
Page 8
March 28, 2022

release which stated in pertinent part:  "After reviewing all of the evidence and pursuant to my responsibility to investigate and prosecute criminal matters within the Judicial District of Danbury, the evidence does not support a conclusion that Attorney Dabela's death was a homicide. Accordingly, the criminal investigation into this matter is closed."  He extended condolences to the family of Gugsa Dabela.

<u>CONCLUSION</u>

Although the family and friends of Attorney Gugsa "Abe" Dabela viewed their son, brother, and friend as someone who had no reason to want to end his own life, as State's Attorney Stephen Sedensky wrote in his released statement, "the evidence does not support a conclusion that Attorney Dabela's death was a homicide."

Materials from the file confirm that State's Attorney Sedensky corresponded with, and met with the family of Attorney Dabela.  At the family's suggestion, State's Attorney Sedensky had law enforcement or members of his office look into every person named by the family with whom Attorney Dabela had a less than cordial, or acrimonious, relationship.  He directed law enforcement to send evidence to the State Forensic laboratory for testing; and, directed all first responders who were dispatched to the crash site to submit DNA samples for comparison to profiles produced from the testing of evidence.  State's Attorney Sedensky directed his own inspectors to conduct a canvass of the area near the crash site, and to speak with persons who may have seen or spoken with Attorney Dabela in his final hours.  At the request of Attorney Dabela's family, the Connecticut State Police were asked to review the reconstruction report and to examine Attorney Dabela's vehicle, and visit the crash scene.  The Dabela family retained an attorney and an investigative team, and State's Attorney Sedensky gave them full access to needed evidence.  In a report provided to this office by the family of Gugsa Dabela, Dr. Albert Harper concluded, "Gugsa was holding his gun close to the right side of his head when the fatal shot was fired, and it is not possible that anyone other than Gugsa fired the fatal shot."  There was no video surveillance from nearby homes; nor evidence of another motorist being involved.  No witnesses to the crash have been identified.

Based upon my review of all the materials cited herein, State's Attorney Sedensky's statement, however succinct, is entirely accurate:  "The evidence does not support a conclusion that Attorney Dabela's death was a homicide."