# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ESTATE OF GUGSA ABRAHAM DABELA, et al. | Case No. 3:16-CV-00534-RNC |
| Plaintiff, | Hon. Robert N. Chatigny |
| v. | |
| TOWN OF REDDING, et al., | |
| Defendants. | |

## REPLY TO DEFENDANTS SUPPLEMENTAL BRIEF AS TO DENIAL OF ACCESS CLAIMS

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

INTRODUCTION ................................................................................................... 1

ANALYSIS .............................................................................................................. 1

    I.    Defendants' Mischaracterizations ................................................................ 1

    II.   Homicide Investigation ................................................................................ 3

    III.  Evidence Tainting ........................................................................................ 4

    IV.  Cover-Up Demonstrates Intent to Shield from Liability ............................. 5

    V.   Suicide Classification and Denial of Access ............................................... 6

CONCLUSION ........................................................................................................ 7

CERTIFICATE OF SERVICE ................................................................................ 9

## TABLE OF AUTHORITIES

**Cases**

*Christopher v Harbury*, 536 US 403; 122 S Ct 2179; 153 L Ed 2d 413 (2002) .......2

*Garlick v. Lee*, 1 F.4th 122 (2d Cir. 2021)..............................................................5

*Oliva v. Town of Greece*, 630 F. App'x 43 (2d Cir. 2015).........................................2

*Sousa v. Marquez*, 702 F.3d 124 (2d Cir. 2012).........................................................2

NOW COMES Plaintiff, by and though counsel, and states as follows:

## INTRODUCTION

Defendants' position fundamentally misstates both the legal standard and the evidentiary standard before the court for a denial of access claim.

As Defendant stated: Judge Chatigny offered the parties the opportunity to brief a specific issue, "I would ask you to focus very specifically on the analysis of the denial of access to court claim, consistent with what I have said today and let me know whether you think the evidence actually does raise a triable issue." **[Defendants' Exhibit A].** The Plaintiff laid out ample evidence in relation to the denial of access to court claims in reliance on the case law directed by Judge Chatigny and further guidance by other circuits.

## ANALYSIS

### I. Defendants' Mischaracterizations

Defendants assert that Plaintiffs' denial of access claim must fail because "Plaintiffs cannot provide sufficient evidence of the identity of the killer." This argument erroneously conflates the access-to-courts standard with the merits of the underlying claim.

The Supreme Court makes clear that "The right of access to courts is violated when systemic official action frustrates a plaintiff's ability to bring suit on a nonfrivolous, arguable claim, regardless of whether the claim would ultimately

1

succeed." *Christopher v Harbury*, 536 US 403; 122 S Ct 2179; 153 L Ed 2d 413 (2002).

Here, Defendants' actions directly foreclosed Plaintiffs' ability to identify the killer(s) and pursue a wrongful death claim as a result of an active cover up.

As provided more fully in Plaintiff's Denial of Access Brief, the claims in *Oliva* were denied where the defendants actions were not the "but-for" cause of plaintiff's inability to sue. *Oliva v. Town of Greece*, 630 F. App'x 43 (2d Cir. 2015). The claims in *Sousa* were denied when it was shown that the plaintiff had first-hand knowledge of the information concealed by the bad actors. *Sousa v. Marquez*, 702 F.3d 124 (2d Cir. 2012).

In the present case, Defendants' bad acts were the "but for" cause of the killer(s) not being identified and the Plaintiffs' inability to sue. By eliminating any opportunity for forensic identification of the killer, Defendants guaranteed that Plaintiff's claim could never be pursued, creating the very evidentiary gaps they now use as a defense.

Plaintiffs' claims align squarely with *Harbury*, *Oliva* and *Sousa*, and the Court must allow a jury to determine whether Defendants' conduct was an obstruction of justice rather than a legitimate investigation. To find that Plaintiffs' claim fails because "Plaintiffs cannot provide sufficient evidence of the identity of the killer" under the facts of this case would render the right to seek redress meaningless and reward obstruction.

## II. Homicide Investigation

Defendants erroneously assert that Plaintiffs' denial of access to courts claim fails because there is insufficient evidence that the investigation would have revealed the identity of the shooter. This argument both mischaracterizes the governing legal standard and invites the Court to scrutinize more closely *the* resultant *effects* of Defendants' prevention of a homicide investigation. The Defendants decision to retain control of the death investigation rather than immediately referring Mr. Dabela's suspicious gunshot death to the Major Crimes Unit as required by CT police procedures, impacted the ultimate outcome.

To wit, the most obvious impact is that had the case had been referred to the Major Crimes Unit, and thus the initial scene review and the ensuing investigation would have been conducted by the proper investigating authority. That change would likely have yielded: (i) collection of cell tower data from the seven towers within four miles of the crime scene, a standard investigative tool for violent crimes, which would have easily identified potential suspects in the area – this information is now lost forever due to Defendants delay; (ii) retrieval of the fatal bullet, which would have yielded a means to test potential murder weapons; (iii) gunshot residue testing of Mr. Dabela's hands and clothing, which would have conclusively ruled out suicide; (iv) transport of Mr. Dabela's vehicle to a secure location in its overturned position, which would have preserved blood spatter evidence enabling clearer reconstruction of the events leading to the fatal injury;

3

(v) DNA testing against the state and federal CODIS databases and, potentially, against familial DNA databases; (iv) witness interviews conducted by trained homicide investigators; and (v) other customary homicide investigatory steps. In short, had standard police procedures been followed, Mr. Dabela's death would have immediately been identified as a homicide, and it would have prompted an investigation by the most highly trained homicide investigators of the Connecticut State Police Department: the Major Crimes Squad.

So, while the Defendants' self-servingly claim that the homicide investigation that they precluded "might not" have yielded identification of the killer, such assertion must be examined by the Court since the Defendants' deviation from standard procedure impacted the ultimate outcome.

### III. Evidence Tainting

Defendants further argue that the Redding police Department, the Office of the Chief Medical Examiner, the Connecticut State Police Western District Major Crime Squad, and the State's Attorney's Office for the Judicial District of Danbury, concluded that the decedent shot himself. This is simply false. Only the Defendant police officers concluded that the decedent shot himself.

As clearly set forth in the record, the Office of the Chief Medical Examiner left the manner of death "Undetermined" for six-months following Mr. Dabela's death and only concluded "suicide" on October 3, 2014, based **solely** on the statements of the Defendant police officers claiming that their investigation

4

established that Mr. Dabela shot himself. The Medical Examiner has testified that: (i) there was no evidence of suicide from his autopsy review of Mr. Dabela's body, (ii) no forensic reports were shared with him and (iii) if the forensic reports had been shared with him, he would **not** have ruled the death a suicide. Similarly, the only conclusion reached by CSP-MCS was that "the evidence did not support a conclusion that a homicide had occurred". Contrary to Defendants' assertion, this is not a conclusion that Mr. Dabela shot himself.

Court should recognize that the Connecticut State Police's conclusion was reached on March 26, 2016, nearly two years after Mr. Dabela's death, on March 26, 2016. Moreover, this delayed conclusion was based not on CSP's independent investigative efforts or evidence collection, but rather it was based entirely on an examination of the "evidence" contained in the Defendants' case file: a case file the Plaintiffs assert was tainted from the beginning to support their claim that the gunshot was "self-inflicted

In this case, only the Defendants have ever claimed that Mr. Dabela "shot himself". Every other agency involved was unknowingly operating within the constraints of an initial cover-up, so their conclusions are inevitably poisoned by the original obstruction. As in *Garlick*, a flawed process undermines the reliability of any conclusion reached through it, regardless of whether multiple entities were involved. *Garlick v. Lee*, 1 F.4th 122 (2d Cir. 2021).

### IV.  Cover-Up Demonstrates Intent to Shield from Liability

5

Defendants' suppression of evidence and procedural manipulation strongly suggest deliberate obstruction rather than investigative error. As more fully discussed in the Plaintiff's Denial of Access brief, courts recognize that when law enforcement conceals or distorts evidence, it raises an inference of an intent to protect a suspect rather than conduct a legitimate investigation.

Defendant Chief Fuchs' publicly declared the gunshot "self-inflicted" in a widely-released press release issued the morning of Mr. Dabela's death before contacting his next of kin and before any forensic testing whatsoever was conducted, ensuring that the case would not be referred to the CSP Major Crimes Unit to assess whether his death was a homicide, and signalling to the killer(s)), and the broader community with potentially relevant knowledge, that the Defendants would cover-up the true facts of Mr. Dabela's death. This set into motion a sprawling pattern of obstruction by Defendants that ensured that no meaningful homicide investigation ever occurred and the killer(s) were never identified. It is reasonable for a jury to infer that such action was intended to shield known individuals from liability.

## V.  Suicide Classification and Denial of Access

Finally, Defendants' brief devotes substantial discussion to DNA testing and buccal swabs of the Defendants and other first responders, concluding that "every police officer, EMT, and firefighter on scene has been ruled out by DNA" implying that the exclusion of such individuals disposes of Plaintiffs' claims. This argument is legally and logically flawed.

6

While this discussion of the 2021 DNA testing is wholly extraneous to the legal question before the Court, it is important to note that Defendants' reliance on DNA results creates an important internal contradiction in their own position.

The Connecticut Crime Lab – DNA Section Report dated July 31, 2014, excluded Mr. Dabela as a contributor to the DNA found on the gun's trigger (four months after Mr. Dabela's death; and, notably, two months before Defendants notified the Medical Examiner that he committed suicide). If Defendants contend that the exact same forensic lab's exact same DNA results conclusively exonerate these police officers and firemen, then by the very same logic, such results must also conclusively establish that Mr. Dabela did not fire the gun recovered at the scene — directly contradicting their suicide theory. Defendants cannot have it both ways.

## CONCLUSION

By preventing homicide-specific investigative procedures, and manipulating agency reviews, Defendants ensured that no suspect could be identified—thereby foreclosing Plaintiff's ability to bring a wrongful death suit.

The cases cited by Defendants—*Oliva* and *Sousa*—do not apply here. Unlike *Oliva*, Defendants' misconduct was the direct cause of Plaintiff's legal injury. Unlike <u>Sousa</u>, Plaintiffs did not have, and could not independently obtain, the critical evidence—cell tower data, DNA testing, ballistics, GSR testing, and

forensic reports—that the Defendants' manipulated, concealed or never collected despite numerous requests from the Plaintiff.

There exists material open questions of fact as to whether Mr. Dabela's death was a homicide or suicide and whether the Defendants deviated from established police procedures in order to suppress evidence of a homicide and shield known individuals from liability and denying the Plaintiffs access to the courts to pursue a wrongful death claim.  Given the overwhelming record of suppression and obstruction and the material open questions of fact, the Court must deny summary judgment. For these reasons, Plaintiff respectfully requests that the Court find these allegations sufficient to support a denial of access claim and permit this matter to proceed to trial.


Dated: February 10, 2025               Respectfully Submitted,

                                       */s/ Keith Altman*
                                       Keith Altman, Esq.
                                       The Law Office of Keith Altman
                                       33228 West 12 Mile Road, Suite 375
                                       Farmington Hills, MI 48334
                                       (248) 987-8929
                                       keithaltman@kaltmanlaw.com
                                       *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of February 2025, I served all opposing counsel with a copy of the foregoing document, by filing same with the Clerk of Court using the CM/ECF system which will send notification of such filing electronically to all counsel of record.

/s/ Keith Altman

Keith Altman, Esq.