UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ESTATE OF GUGSA ABRAHAM DABELA, :
et al.,                          :
                                 :
     Plaintiffs,                 :
                                 :
v.                               :    Case No. 3:16-cv-534 (RNC)
                                 :
TOWN OF REDDING, et al.,         :
                                 :
     Defendants.                 :

<u>RULING AND ORDER</u>

This case involves a dispute about whether a young African-American man took his own life, the conclusion reached by the Office of the Chief Medical Examiner, the Connecticut State Police and the Office of the State's Attorney, or was the victim of a homicide covered-up by the Redding Police Department, as alleged by his Estate in this long-pending litigation.

Gugsa Abraham Dabela ("Mr. Dabela"), a member of the Connecticut Bar, tragically died in Redding at age 35 as a result of a gunshot wound to the head following a rollover crash of his SUV.  Redding police officers who responded to the crash scene presumptively concluded that he committed suicide.  At the request of his family, the case was referred to the Connecticut State Police for further investigation.  A forensic specialist acting on behalf of the State Police concluded that the evidence did not support a finding of homicide.

1

Mr. Dabela's personal representative, acting on behalf of his estate, then brought this case under 42 U.S.C. §§ 1983 and 1985 against a total of ten defendants, including Redding Chief of Police Douglas Fuchs, and the officers who responded to the crash scene, Sergeants Marc DeLuca, Timonthy Succi and Officer Brandon Kaufman.  The theory of the Estate's case against these defendants is that Redding has few minority residents, and Mr. Dabela was a staunch advocate of Second Amendment rights, which was upsetting to Chief Fuchs, who did not like Mr. Dabela.  In addition, the complaint includes a wrongful death claim against "Killer John Doe," an individual unknown to the Estate who is said to have maliciously shot Mr. Dabela.[1]

At this time, the principal claims are: (1) a claim that the officers, acting in concert, intentionally failed to conduct a proper investigation because of Mr. Dabela's race in violation

---

[1] As originally filed, the complaint contained a total of ten counts.  The following counts remain: (1) Count II brought under § 1983 against the Town of Redding and Chief Fuchs for denial of Mr. Dabela's right to equal protection; (2) Count IV, brought under § 1983 against all defendants for denial of the Estate's right of access to courts; (3) Count V brought under § 1983 against Chief Fuchs for engaging in conduct that encouraged others, including his subordinates, to commit violent acts against Mr. Dabela; (4) Count VI, brought under § 1983 against the Town and Chief Fuchs for failure to implement appropriate policies and training resulting in an improper investigation of Mr. Dabela's death; (5) Count VII, brought under §§ 1983 and 1985 against all defendants for conspiracy to cover up the true nature of Mr. Dabela's death in violation of his right to equal protection; and (5) Count IX, brought against "Killer John Doe."

of his right to an unbiased investigation under the Equal Protection Clause of the Fourteenth Amendment, and (2) a claim that the officers have engaged in a cover-up for the purpose of preventing the Estate from identifying "Killer John Doe" in violation of the Estate's constitutional right of access to courts to pursue the wrongful death claim alleged in the complaint.

With discovery completed, the defendants have moved for summary judgment. After careful consideration, I conclude that summary judgment must be granted on the equal protection claim because Mr. Dabela's right to an unbiased investigation did not survive his death and on the access to courts claim because it is not adequately supported by the underlying wrongful death claim. I also conclude that the Estate's request for an opportunity to file a motion for leave to amend the complaint should be denied. Accordingly, judgment will enter dismissing the action.

I.    Facts

The assertions of fact in the defendants' Local Rule 56 statement of undisputed material facts have been objected to on various grounds. But they have not been contested in the manner required by the rule nor seriously disputed in the briefing. The Estate's opposition to summary judgment is premised instead on opinions in expert reports. Though the defendants'

assertions of fact may therefore be deemed admitted, as provided by Local Rule 56, in determining whether summary judgment is appropriate, I have reviewed all the available evidence in a light most favorable to the Estate.

Based on extended review of the entire record, I find the following facts to be undisputed, beyond genuine dispute or supported by the record viewed most favorably to the Estate.

A.  The Crash of Mr. Dabela's SUV and the Aftermath

On Saturday, April 5, 2014, at about 1:30 AM, Mr. Dabela was driving his SUV on a two-lane road in Redding where the speed limit is 25 miles per hour and there are no lights.  The road was wet from rain.  Mr. Dabela had been drinking at a bar in Redding, where he was seen departing alone.  He had a blood alcohol content level of 0.20, two and a half times the legal limit.  When he came to a curve in the road, he lost control of the SUV, which rotated, left the road, went up an embankment and came to rest on its roof.  Based on skid marks, damage to the vehicle, and the vehicle's location, he was traveling between 40 to 50 miles per hour as he approached the curve. A motorist who passed the scene called 911 and reported seeing what appeared to be a single vehicle rollover accident.

Officer Kaufman was working the night shift.  He was dispatched to the scene and arrived at 1:39 AM.  Sgt. DeLuca, the night shift supervisor, arrived within one to three minutes.

Together they removed Mr. Dabela from the SUV and were administering CPR when emergency medical personnel arrived and relieved them.  Efforts by the emergency medical personnel to save Mr. Dabela were unsuccessful and he was pronounced dead at 2:11 AM.

Detailed reports prepared by Officer Kaufman and Sgt. DeLuca concerning their activities prior to the arrival of the emergency medical personnel can be summarized as follows.  The scene of the crash was dark due to the absence of lighting. When Officer Kaufman arrived, he approached the overturned SUV and saw that the driver's window was shattered.  The driver of the SUV, its sole occupant, lay across the ceiling of the vehicle beneath the driver's seat.  His head was on the driver's side and his feet the passenger's side.  Officer Kaufman called out to him and got no response.  The driver's door was partially ajar but wedged into the ground.  After Sgt. DeLuca arrived, the officers were able to force the door open and remove the driver. They did not recognize him.  He was bleeding from a head wound, which the officers assumed to be a result of the crash, and did not appear to be breathing.  Sgt. DeLuca tried using a defibrillator without success.  Both officers then administered CPR continually until they were relieved by the emergency medical personnel.

5

After Mr. Dabela's body was removed from the SUV, an empty pistol holster was in plain view on his right hip. A pistol registered to him lay on the ceiling of the SUV below the driver's seat - a sub-compact .40 caliber Springfield Armory Model XD-40 with a 10-round magazine in the grip.

Identification in Mr. Dabela's wallet showed his home address. Sgt. DeLuca and Officer Kaufman had briefly encountered Mr. Dabela at that address two months before when they responded to a signal from the alarm system. It was their only prior contact with him and an uneventful one.

Sergeants Succi and Quinn, both experienced in accident reconstruction, arrived at the scene along with a photographer, Dick Aarons, in response to Sgt. DeLuca's radioed request for assistance with a fatal accident.

Mr. Dabela's body was placed in an ambulance. With the benefit of the ambulance's interior lighting, Sgt. Succi could see that the head wound was the result of a gunshot rather than blunt force trauma.

Sgts. Succi, Quinn and DeLuca, the senior officers at the scene, discussed how to proceed. They presumptively concluded that Mr. Dabela had committed suicide and, accordingly, that calling the Connecticut State Police for assistance with the forensic investigation was unnecessary. Captain O'Connell was contacted by phone and he agreed with their assessment.

Sgt. DeLuca placed bags on Mr. Dabela's hands to preserve any evidence of gunshot residue.

The Office of the Chief Medical Examiner took Mr. Dabela's body from the scene and scheduled an autopsy to take place the next day, Sunday, April 6.

The SUV was placed in an upright position for towing.  In the process, a spent .40 caliber cartridge case fell from the SUV onto a collection tarp.  The cartridge case matched ammunition in the magazine of Mr. Dabela's pistol.  The officers also found a bullet hole in the driver's seat of the SUV, which they attributed to the bullet that killed Mr. Dabela.

Sgt. Deluca went to Mr. Dabela's home address to make a death notification.  He met the homeowners, Peter and Leslie Swan, who rented a room to Mr. Dabela, and told them Mr. Dabela had been in a fatal accident.  Mrs. Swan provided contact information for the Dabela family in Maryland.

At about 7:30 AM, Sgt. DeLuca received a call from Mr. Dabela's father, Dr. Abraham Dabela.  He told Dr. Dabela his son had been in a fatal motor vehicle accident and the investigation was ongoing.  He did not mention the gunshot wound.

That afternoon, Chief Fuchs issued a press release regarding Mr. Dabela's death, disclosing his name and stating that he died of a gunshot wound that appeared to be self-inflicted.  The press release stated that the incident was under

7

investigation and requested information from anyone who witnessed the crash or saw Mr. Dabela earlier in the day.

B.   Autopsy and Certification of Manner of Death

On April 6, Sgt. Succi went to the office of the Chief Medical Examiner to be present for Mr. Dabela's autopsy.  He told Dr. Ira Kanfer, who would be performing the autopsy, that there was evidence at the crash scene suggesting Mr. Dabela committed suicide.  Dr. Dabela and his family were also present in the office.  At the conclusion of the autopsy, Dr. Kanfer reported to the Dabela family that Mr. Dabela most likely died instantly.  His official report stated that the cause of death was "pending further studies" and the manner of death was "pending."

Six months later, on October 3, 2014, Dr. James Gill, the Chief Medical Examiner, certified that the manner of Mr. Dabela's death was by suicide.

C.  Forensic Tests

During the period between the autopsy and certification of death, the following tests were done.

DNA Testing

DNA testing was done on Mr. Dabela's pistol.  Tests were performed on tissue-like material and blood on the muzzle, blood

on the magazine, and swabbings from the trigger, grip, slide pull area and magazine.  All these contained Mr. Dabela's DNA profile except the trigger swabbing, which contained a mixture from which he was excluded.

As a result of additional DNA testing during the pendency of this case, all the defendants have been excluded as contributors to the DNA found on the pistol, including the mixture on the trigger.

### Gunshot Residue Testing

Gunshot residue testing was done on the cuffs of Mr. Dabela's jacket.  No gunshot residue was found.

Mr. Dabela's hands were not tested for gunshot residue.[2]

### Driver's Seat

The State Crime Lab received the driver's seat from the SUV for examination to determine whether the hole in the seat was caused by a bullet and, if so, to recover the bullet.  The Lab concluded that the hole was caused by a cigarette burn.

### Ballistics

Given the results of the examination of the driver's seat, officers returned to the scene to search for the bullet that killed Mr. Dabela.  Using a metal detector to sweep the area

---

[2] The only explanation for this omission shown by the record is Sgt. Succi's testimony that on inquiring why the test was not done, he was told that Mr. Dabela's body was washed prior to viewing by the family.

9

where the SUV overturned, they found a .40 caliber bullet in the dirt where it had been exposed to the elements for between four and five days.  No biological material was found on the bullet.

The bullet was submitted to the State Lab Firearms Section along with the pistol, magazine, ammunition, and cartridge casing found in the SUV.

Test firings of the pistol and ammunition were performed using the pistol.  On microscopic comparison, the bullet and cartridge casing were found to be consistent with test-fired bullets and spent cartridges.  However, neither the bullet or the cartridge casing could be identified or eliminated as having been fired from the pistol due to a lack of sufficient agreement of individual characteristics and a lack of detail.

D.   Investigation By Connecticut State Police

At the request of the Dabela family, the case was referred to the Connecticut State Police for further investigation. State Police personnel conducted interviews and prepared reports.  Sergeant Mark Davison, a forensic specialist employed by the State Police, issued a reconstruction report in which he analyzed the evidence.  He concluded that the gunshot wound was self-inflicted.

Sgt. Davison's conclusion is based on the following:

- Blood spatter, drip stains and saturation in the SUV establish that Mr. Dabela was shot while he was inside the SUV.

10

- Given the bullet trajectory shown by the entry and exit wounds and blood spatter on the SUV's ceiling liner, the gunshot occurred while the right side of Mr. Dabela's head was facing the interior of the vehicle.

- Mr. Dabela's seat belt was unbuckled but not retracted, indicating that it was unbuckled after the crash, and any injury he sustained in the crash was not incapacitating, so he would have been able to unbuckle the seat belt.

- The close contact entry wound establishes that the muzzle of the firearm that produced this wound was held against or very close to the right side of Mr. Dabela's head.

- Mr. Dabela's tissue and blood were sprayed onto the muzzle of his pistol as a result of the gunshot.

And,

- Blood spatter on Mr. Dabela's right hand is consistent with the pistol having been held in that hand – his dominant hand - at the time it was fired.[3]

The Estate does not dispute the data underlying Sgt. Davison's conclusion.  To support its position that Mr. Dabela did not commit suicide, it relies on the absence of Mr. Dabela's DNA profile from the pistol's trigger, the absence of gunshot residue on the cuffs of his jacket, and the absence of blood or DNA on the bullet found at the scene.  The Estate presents expert opinion testimony that the absence of Mr. Dabela's DNA from the trigger means he did not fire the weapon,

---

[3] Sgt. Davison noted that there were no other passengers in the SUV at the time of the crash and gaining entry to the interior of the SUV after the crash would have been impossible via the front passenger door (which was in close contact with a stone wall) and difficult via the rear passenger door (which was partially obstructed by a sapling).

and the absence of his DNA from the bullet means the actual bullet is missing.  The Estate argues that since Mr. Dabela did not fire the weapon, it is reasonable to infer it was fired by a police officer, and since the bullet is not the one that killed Mr. Dabela, the police either failed to find or are suppressing the one that did.

The defendants respond that the conclusions of the Estate's experts are ill-founded because the absence of Mr. Dabela's DNA from the trigger of his gun and from the bullet found at the scene must be considered along with all the evidence in order to support a reliable manner of death determination.[4]

E. Investigation of Mr. Dabela

Beginning the day of the crash, law enforcement personnel conducted witness interviews and record checks concerning Mr. Dabela's background, circumstances and recent activities.  As a result, the following information was obtained.

---

[4] The defendants argue that the opinions of the Estate's experts would not be admissible at trial and should therefore be disregarded but they have not moved to exclude the opinions under Daubert.  In the absence of a Daubert motion, the Estate has not had an opportunity to demonstrate that the opinions of its experts are sufficiently supported by forensic principles and the record evidence.  Nonetheless, it appears to be beyond dispute that a homicide determination based on the absence of Mr. Dabela's DNA from the trigger and the bullet and the absence of gunshot residue from the jacket cuffs would not pass muster under Daubert.

At the time of his death, Mr. Dabela was renting a room where he lived alone.  His girlfriend had just broken up with him.  He had been drinking more than usual.

Mr. Dabela had lost his position as an associate at a law firm about a year before and was trying to start a solo practice.  He told people he was working on some important cases but a search of the Connecticut Judicial Branch website disclosed no case in which he had an appearance as counsel.

On the Friday night preceding the crash, Mr. Dabela spent time at two bars.  He went by himself but interacted with others in a friendly manner and appeared to be in a good mood.

Some witnesses reported seeing Mr. Dabela drink a couple of beers.  One said he was also drinking shots of liquor, which would explain his blood alcohol content level of .20.

An employee of the bar where Mr. Dabela was drinking immediately before the crash said she thought he was high on drugs.  Women at the bar told police he invited them to go back to his house "to party," implying that he had illegal drugs, but they declined.

Mr. Dabela's family members, friends and associates were interviewed regarding his behavior and demeanor in the days and weeks preceding his death.  They provided a wide range of views.

Family members and a close friend said he had recently been with them, or in touch with them, and had talked about plans for

13

the future while giving them no reason to think anything was wrong.

On the other hand, Mr. Dabela's girlfriend reported that he was upset by her decision to end their relationship, that he considered himself a failure, and that he told her if things got too bad he would just end it with his gun.

Similarly, Mr. Swan recounted an occasion when he and Mr. Dabela were drinking and Mr. Dabela told him: "If ever things get too tough, you just take a gun, put it to the back of your head and end it."  According to Mr. Swan's account, Mr. Dabela then raised his right hand as if aiming a gun at an area behind his right ear and moved his finger as if pulling the trigger.

F.  Opinion of Retained Consultant

Dr. Albert B. Harper, the principal of Forensic Science Consortium, a consulting firm, was retained by the Dabela family to evaluate the cause of Mr. Dabela's death.  Chief Fuchs offered to provide Dr. Harper with all photos taken at the scene, all police reports, all evidence in the custody of the Department and access to the SUV.[5]  On completing his review, Dr. Harper concluded that Mr. Dabela committed suicide.

---

[5] Though Dr. Harper was given access to the defendants' reports, he was not permitted to conduct interviews.  The Estate seems to suggest that this supports an inference of a cover-up.  But the officers were not obliged to submit to interviews by Dr. Harper and there is no indication that they have failed to cooperate in discovery.

G.   State's Attorney's Report

After this case was filed, State's Attorney Stephen J. Sedensky III, requested that Inspector Donald A. Brown of the Danbury State's Attorney's Office investigate the case and issue a report.   Inspector Brown reviewed Redding Police Department reports, Connecticut State Police reports, and the Chief Medical Examiner's autopsy reports, and conducted follow-up interviews of witnesses.   He then issued a detailed 11-page report dated July 10, 2017, which explains that the evidence does not support a finding of homicide.   ECF 108-1 (ex. D).

II.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, summary judgment is warranted only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   A material fact is one that would affect the outcome of the suit under the governing law; a dispute is genuine if the evidence would permit a reasonable factfinder to return a verdict for the nonmoving party.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).   Properly applied, Rule 56 enables a court to determine "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law."   Id. at 251-52.

When evaluating a defendant's motion for summary judgment,

15

the following principles apply.  The defendant has the initial burden of showing that the evidence is insufficient to support an essential element of the plaintiff's claim.  The plaintiff must then set forth specific facts showing that there is a genuine issue for trial.  The function of the court is not to resolve disputed issues of fact but only to determine whether a genuine dispute exists with regard to a material fact.  Lara-Grimaldi v. County of Putnam, 132 F.4th 614, 633 (2d Cir. 2025). In making this determination, the court does not assess credibility of witnesses or weigh evidence but instead credits evidence favorable to the plaintiff if a jury could credit it and gives the plaintiff the benefit of all inferences reasonably supported by the evidence.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  Evidence favorable to the defendant is disregarded unless it is undisputed or comes from a disinterested source and is uncontradicted and unimpeached, in which case it may be given credence by the court.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000).  Summary judgment should be granted when the plaintiff's evidence is merely colorable, conclusory, speculative or not significantly probative.  Anderson, 477 U.S. at 249-50.

III.  Discussion

    A.  Equal Protection Claim

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The Estate claims that the defendants violated Mr. Dabela's right to equal protection by failing to conduct a proper investigation into his death because of his race.

An individual does not have a federal constitutional right to a police investigation.  See DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189, 196 (1989) (the Constitution "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary secure life, liberty, or property interests of which the government itself may not deprive the individual."); Harrington v. County of Suffolk, 607 F.3d 31, 32–33 (2d Cir. 2010)(parents' claim that defendants violated their constitutional rights by failing to conduct adequate investigation into traffic accident that resulted in death of their son failed to state a claim under 42 U.S.C. § 1983); accord Kern v. Contento, No. 21-1672, 2022 WL 1112767, at *2 (2d Cir. Apr. 14, 2022).[6]  However, a state "may

---

[6] See also Rossi v. City of Chicago, 790 F.3d 729, 735 (7th Cir. 2015)("While *DeShaney* does not address police behavior specifically, the implication is clear: mere inactivity by police does not give rise to a constitutional claim."); Boseski

not deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." DeShaney, 489 U.S. 197 n.3.

The defendants seek summary judgment on the equal protection claim on the grounds that the Estate provides no evidence showing either that (1) Mr. Dabela was treated differently from other similarly situated individuals, or (2) the defendants intentionally discriminated against him on the basis of race.  In their supplemental brief, they also contend that Mr. Dabela's right to an unbiased investigation did not survive his death.

The Estate contends that the evidence shows that Mr. Dabela's case was treated differently than other suicide cases.  In its supplemental brief, it submits that the equal protection

---

v. N. Arlington Municipality, 621 F.App'x 131 135 (3rd Cir. 2015)("[Plaintiff] has no cognizable claim against a government entity for its failure to investigate or bring criminal charges against another individual."); Buari v. City of New York, 530 F. Supp. 3d 356, 391 (S.D.N.Y. 2021)(there is no constitutional right to an adequate investigation so a claim for failure to investigate is not cognizable under section 1983); Antonetti v. City of New York, 422 F. Supp. 3d 668, 671-72 (E.D.N.Y. 2017)(victim of allegedly criminal conduct is not entitled to an investigation of the crime or prosecution of the alleged perpetrator, nor is there a constitutionally protected right to an investigation by government officials of alleged wrongdoing by other officials); Osuch v. Gregory, 303 F. Supp. 2d 189, 194 (D. Conn. 2004) ("An alleged victim of a crime does not have a right to have the alleged perpetrator investigated or criminally prosecuted.").

18

claim "is not a personal claim limited to the decedent's experiences but one that directly impacts the Estate's ability to seek justice and legal remedies."  ECF 191, at 17.

The equal protection claim is explicitly brought on behalf of Mr. Dabela.  Under existing case law, Mr. Dabela had no constitutional right to an unbiased investigation into the cause of his death.  See Infante v. Dignan, 782 F. Supp. 2d 32, 38 (W.D.N.Y. 2011) ("After death, one is no longer a person within our constitutional and statutory framework, and has no rights of which he may be deprived.") (quoting Whitehurst v. Wright, 592 F.2d 834, 840 (5th Cir. 1979); see Ford v. Moore, 237 F.3d 156, 165 (2d Cir. 2001) (granting motion to dismiss on the ground that deceased plaintiff had no constitutional protections pertaining to conduct that occurred after his death).  The injury claimed by the Estate – obstruction of its ability to pursue a wrongful death claim – provides the basis of its access to courts claim.

Accordingly, the equal protection claim will be dismissed.[7]

_____

[7] I agree with the defendants that the equal protection claim fails to raise a genuine issue of material fact in any event because the alleged differential treatment does not support a reasonable inference of intentional discrimination.

B.   Access to Courts Claim

The Estate claims that the defendants have engaged in a cover-up for the purpose and with the effect of preventing it from pursuing a wrongful death claim against "Killer John Doe" in violation of its right of access to courts.

In Christopher v. Harbury, 536 U.S. 403 (2002), the Supreme Court recognized that efforts by government officials to obstruct an individual's attempt to obtain judicial relief on a cognizable legal claim may violate the Constitution, entitling the individual to bring a claim for denial of the constitutional right of access to courts.[8]

Under Harbury and subsequent decisions of lower courts, to prevail on its claim as to any of the defendants, the Estate must present sufficient evidence to permit a reasonable finding that (1) it has a "nonfrivolous" or "arguable" wrongful death

---

[8] Access to courts claims can be forward-looking or backward-looking. In forward-looking clams, plaintiffs allege that systemic official action frustrated their ability to file suit. Sousa v. Marquez, 702 F.3d 124, 127 (2d Cir. 2012) (quoting Harbury, 536 U.S. at 413). Backward-looking claims cover "specific cases that cannot now be tried (or tried with all material evidence)" due to the actions of state officials. Harbury, 536 U.S. at 413-14 & n. 11. Here, the Estate brings a backward-looking claim predicated on the defendants' alleged obstruction of the Estate's efforts to pursue the wrongful death claim in the complaint. The Second Circuit has stated that the viability of backward-looking claims is "far from clear," Sousa, 702 F.3d at 128, and it has not definitively established the elements of such a claim in this Circuit. However, I assume relief can be granted when the requirements discussed in the text are met.

claim against "Killer John Doe," see Harbury, 536 U.S. at 414–16; (2) the defendant took actions that obstructed or impeded the Estate's ability to pursue the wrongful death claim; (3) the defendant's actions were deliberate and malicious; and (4) the Estate's efforts to obtain redress through the wrongful death claim have been foreclosed by the defendant's conduct. See Sousa, 702 F.3d at 128-29; DeMeo v. Tucker, 509 F. App'x 16, 18 (2d Cir. 2013); Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003).[9]

The underlying claim the Estate seeks to vindicate is a wrongful death claim under Conn. Gen. Stat. § 52-555.  This statute requires that the claim be brought against the person whose negligence or wrongful act caused the death.  The wrongful death claim in the complaint is against "Killer John Doe." Because the wrongdoer is not identified, the claim lacks an arguable basis in law and fact.  Put differently, it has no possibility of success.

In access to courts cases brought to vindicate wrongful death claims against police, plaintiffs have succeeded when it was clear that the decedent was killed by one or more officers. See, e.g., Bell v. City of Milwaukee, 746 F.2d 1205, (7th Cir.

---

[9] Normally, a backward-looking access to courts claim is not ripe if the underlying claim has been filed and remains pending.  In this case, however, the access to courts claim and wrongful death claim can be resolved together.

21

1984), overruled on other grounds by Russ v. Watts, 414 F.23d 783 (7th Cir. 2005).  In such a case, the issue is whether the defendants violated the decedent's survivors' right of access to courts by falsely claiming that the killing was justified and by covering up evidence supporting a finding of homicide.  No case has been cited or found where a Harbury claim predicated on a wrongful death claim against an unidentified perpetrator survived summary judgment.

However, the Estate argues that it has an arguable basis for its claim that Mr. Dabela was the victim of a homicide and its efforts to identify "Killer John Doe" have been foreclosed by the defendants' alleged cover-up.  When a plaintiff bringing a Harbury claim predicated on a wrongful death claim presents evidence supporting a finding of homicide, dismissing the Harbury claim because the plaintiff is unable to identify the perpetrator could reward the very cover-up alleged by the plaintiff, a result antithetical to basic principles of justice.

This can be avoided by applying the spoliation of evidence doctrine.  The Second Circuit has defined "spoliation" as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999).  Spoliation-based adverse inferences are appropriate when a party

22

that had an obligation to collect and preserve evidence failed to do so with a culpable state of mind.  See Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998).

Applied here, the spoliation doctrine gives the Estate an opportunity to potentially avoid summary judgment on the access to courts claim if it can show that (1) a proper investigation would have produced evidence supporting a finding of homicide; (2) the defendants destroyed or failed to collect and preserve such evidence with a culpable state of mind; and (3) but for the defendants' wrongful conduct, there would have been a reasonable likelihood of identifying the perpetrator.  See Flagg v. City of Detroit, 715 F.3d 165, 179 (6th Cir. 2013) (affirming summary judgment for defendants because decedent's survivors failed to point to evidence supporting such a reasonable probability).

The record does not raise a genuine issue of material fact as to any of the requirements of the spoliation doctrine.

The record shows that in distinguishing between homicide and suicide in a gunshot case, a forensic expert considers:

- Wound characteristics, principally, entry wound location, angle of trajectory, distance of discharge, and presence or absence of close-contact stippling;

- Physical positioning of the body and weapon;

- Presence or absence of the decedent's DNA profile on the weapon;

- Presence or absence of gunshot residue on the decedent's hands and clothing;

- Presence or absence of indications of suicidal ideation; and

- Presence or absence of precipitating circumstances associated with suicide.

In this case, the investigation did not destroy or fail to collect and preserve evidence of this nature.  Rather, the evidence produced by the investigation permits analysis of each factor and shows the following:

- The wound characteristics are consistent with self-infliction;

- The positioning of Mr. Dabela's body in the SUV as described by the officers and as shown by the physical evidence is consistent with self-infliction;

- Mr. Dabela's DNA was found everywhere on the pistol except the trigger;

- Mr. Dabela's tissue and blood on the muzzle of the pistol and blood on his right hand are consistent with self-infliction;

- Mr. Dabela's girlfriend reports that he talked about shooting himself with his pistol;

- Mr. Swan reports that Mr. Dabela demonstrated how he might commit suicide in the very manner shown by the evidence;

  and

- The shooting was precipitated by a rollover crash making it likely that Mr. Dabela would be arrested and prosecuted for driving while intoxicated, which, in

24

turn, would likely lead to disciplinary proceedings affecting his right to practice law.

All these factors support the determination made by Chief Medical Examiner Gill, State Police Sgt. Davison, Inspector Brown, State's Attorney Sedensky and Dr. Harper that Mr. Dabela took his own life.  The only factors that do not affirmatively weigh in favor of suicide as the manner of death are the absence of Mr. Dabela's DNA profile from the trigger of his pistol and the lack of gunshot residue on his sleeves. Because these factors are equivocal, they do not detract from the weight of the other factors or support an inference of a cover-up.

The Estate contends that the defendants were required to assume the shooting was a homicide and entrust the forensic investigation to the State Police from the start.  But the Estate offers no evidence, in the form of expert opinion or otherwise, that a non-conflicted investigation by the State Police begun on the day of the crash would have produced evidence supporting a homicide determination and creating a reasonable likelihood of identifying the perpetrator.

The Estate emphasizes that Mr. Dabela's hands were not tested for gunshot residue.  It is anomalous that no gunshot residue test was done on Mr. Dabela's hands, especially since the cuffs of his jacket were tested.  It is undisputed, however,

25

that Sgt. DeLuca placed bags on Mr. Dabela' hands to preserve any gunshot residue and the bags were in place when Mr. Dabela's body was removed from the scene by the Office of the Chief Medical Examiner.  The evidence, viewed fully and most favorably to the Estate, is insufficient to support a reasonable inference that Sgt. DeLuca or any other defendant arranged for Mr. Dabela's hands to be washed before a gunshot residue test could be performed.[10]

Because the record does not support a spoilation-based adverse inference in favor of the Estate, the wrongful death claim against "Killer John Doe" does not provide an adequate basis for the access to courts claim.

Accordingly, summary judgment will be granted on both the access to courts claim and the claim against "Killer John Doe."[11]

---

[10] The Estate's other criticisms of the investigation are immaterial.

[11] The defendants contend that they are entitled to summary judgment on the access to courts claim based on the affirmative defense of qualified immunity because the law was not clearly established that the acts and omissions shown by the record would violate the Estate's right of access to court.  Because the Estate has failed to prove a violation, it is unnecessary to address the issue of qualified immunity.  In the interest of completeness, however, I note that even if the record raised a genuine issue of fact as to whether the Estate's right of access to courts has been violated, the defendants would still be entitled to summary judgment because the record does not raise a genuine issue as to the defendants' right to qualified immunity. Summary judgment is granted on the other remaining claims – Counts V (state created danger claim), VI (Monell claim) and VII (civil rights conspiracy claim) - because these claims are

26

C.    <u>Leave To Amend</u>

The Estate has not filed a motion for leave to amend the complaint but requests in its opposition briefing that leave to amend be granted if the "Court finds in favor of the Defendant in any of the contested matters."  ECF No. 121, at 46.  I deny this request principally on the ground of futility.

Despite extensive discovery, the Estate lacks evidence from which a jury could reasonably return a verdict in its favor against any of the defendants.  In particular, the summary judgment record, viewed fully and most favorably to the Estate, does not support a reasonable finding that the defendants have covered up a homicide.  There is no reason to think the Estate could develop such evidence if leave to amend were granted.

In its most recent submissions, the Estate suggests that Sgt. DeLuca could be "Killer John Doe."  The Estate does not state or imply that it would like to amend the wrongful death claim to substitute him as the defendant.  Nonetheless, given the Estate's statement that Sgt. DeLuca could be "Killer John Doe," I have considered whether such an amendment, if requested, could reasonably be granted.  I conclude that the answer is no.

---

either brought on behalf of Mr. Dabela or rely on unsubstantiated allegations that the defendants engaged in a cover-up.

27

There is no evidence that Sgt. Dabela has ever said or done anything manifesting racist sentiments.  As far as the record shows, he has never been the subject of a citizen's complaint alleging use of excessive force.  There is no indication that he has ever been placed on leave because of suspected wrongdoing or to accommodate a mental or emotional condition.

The Estate's suggestion that Sgt. DeLuca could be "Killer John Doe" appears to be based on the mere fact that he had an opportunity to shoot Mr. Dabela before the emergency medical personnel arrived.  Officer Kaufman also had an opportunity to shoot Mr. Dabela during that interval.  Indeed, he had an opportunity to shoot Mr. Dabela before Sgt. DeLuca arrived.  But the Estate does not now suggest that Officer Kaufman could be "Killer John Doe."

The only evidence that distinguishes Sgt. DeLuca from Officer Kaufman as a potential suspect in this case are sworn statements by members of the Dabela family that soon after the crash Sgt. DeLuca told them he had the same type of pistol as Mr. Dabela, and offered to show it to them, which Sgt. DeLuca denies.[12]  Accepting the family's description of the disputed conversation, and viewing it most favorably to the Estate, it

---

[12] Sgt. DeLuca has testified that while on duty he carried only his service pistol, a Glock, and although he owns other types of firearms, he has never owned the type of pistol at issue here.

28

does not support a reasonable hypothesis that Sgt. DeLuca shot Mr. Dabela.  The physical evidence on the muzzle of Mr. Dabela's pistol shows that he was shot with his own gun, not a similar gun owned by someone else.

Given the undisputed evidence, it is not possible to construct a plausible scenario in which Sgt. DeLuca killed Mr. Dabela.  If one imagines that Mr. Dabela was conscious when Sgt. Dabela arrived at the scene (contrary to the report of Officer Kaufman), and some type of confrontation immediately ensued, Sgt. DeLuca would have had to reach into the overturned SUV, taken Mr. Dabela's pistol away from him, then used it to shoot him, not while holding the pistol outside the SUV, but while awkwardly reaching into the SUV in order to shoot him in the right side of the head, as would be necessary to cause the wound characteristics and bullet trajectory shown by the forensic evidence.  An officer bent on shooting Mr. Dabela would not reach into the SUV in this manner because it would needlessly give Mr. Dabela a chance to grab the pistol back.  And it is hard to imagine that Mr. Dabela, even in an intoxicated state, would allow Sgt. DeLuca to hold the pistol against (or very near) his head and pull the trigger when he could grab the pistol or push Sgt. DeLuca's arm away.

If, alternatively, one imagines that Mr. Dabela was nonresponsive when Sgt. DeLuca arrived (as reported by Officer

29

Kaufman), the challenge of constructing a plausible homicide scenario is even greater because in that case the shooting would be wholly unprovoked and thus nonsensical from any point of view.  Even a racist officer prone to violence and heedless of his own interests would not shoot Mr. Dabela as he lay unconscious in the overturned SUV.

On this record, a wrongful death claim against Sgt. DeLuca would present no more than a sheer possibility that he acted unlawfully.  Granting leave to amend to substitute him for "Killer John Doe" would therefore be futile.[13]

IV.    Conclusion

Accordingly, it is hereby ordered that the motion for summary judgment is granted and the complaint is dismissed without leave to amend.

The Clerk is requested to enter judgment and close the

---

[13] Inordinate delay and prejudice to the defendants also weigh against granting leave to amend.  Mr. Dabela's family has opposed a suicide determination since learning of his tragic death and invested substantial time and resources in an effort to show that he did not take his own life.  Since this case was filed, the Estate has had ample opportunity to conduct discovery in support of its claims, including the claim against "Killer John Doe"; it has not been hindered in pursuing the litigation; and it has had adequate opportunity to present arguments in opposition to summary judgment through initial and supplemental briefing.  Granting leave to amend now would further delay resolution of the dispute concerning the manner of Mr. Dabela's death and at the same time cause undue prejudice to the defendants, who have expended substantial time and resources demonstrating that they are entitled to entry of judgment in their favor.

file.

So ordered this 30th day of March 2026.

                              _____/s/ RNC_____
                                    Robert N. Chatigny
                              United States District Judge